## No. 17,241.

## UNION PACIFIC RAILROAD COMPANY, ET AL. *v.* OIL AND GAS CONSERVATION COMMISSION OF THE STATE OF COLORADO, ET AL.

(284 P. [2d] 242)

Decided May 16, 1955.   Rehearing denied June 20, 1955.

Messrs. HUGHS & DORSEY, Mr. MONTGOMERY DORSEY, Mr. E. G. KNOWLES, Mr. W. CLAYTON CARPENTER, Mr. WALTER E. WILL, Messrs. BLACK & STAYTON, Mr. JOHN W. STAYTON, Mr. W. R. ROUSE, Mr. HENRY M. ISAACS, Mr. D. O. CHURCHILL, of Counsel, for plaintiffs in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. WILBUR ROCCHIO, Assistant Attorney General, for defendants in error, Oil and Gas Conservation Commission of the State of Colorado; WARWICK M. DOWNING, F. M. VAN TUYL, RUSSELL VOLK, H. C. BRETSCHNEIDER, and JOHN E. CRONIN, as members of the Commission, and JOHN E. CRONIN as State Oil Inspector.

Mr. L. A. THOMPSON, Mr. W. W. HEARD, Mr. JOHN F. JONES, Messrs. HOLME, ROBERTS, MORE, OWEN & KEEGAN, Mr. HAROLD D. ROBERTS, Mr. TED P. STOCKMAR, for defendant in error, Stanolind Oil and Gas Company.

Mr. L. M. LAMAR, Mr. WOOLLEN H. WALSHE, Mr. R. W. SULLIVAN, Messrs. AKOLT, CAMPBELL, TURNQUIST & SHEPHERD, Mr. JOHN P. AKOLT, Mr. JOHN P. AKOLT, JR., for defendant in error, The California Company.

Mr. RAYBURN L. FOSTER, Mr. HARRY D. TURNER, Mr. R. M. WILLIAMS, Messrs. GORSUCH, KIRGIS, CAMPBELL, WALKER & GROVER, Mr. FREDERIC L. KIRGIS, Mr. R. D. COPLEY, JR., for defendant in error, Phillips Petroleum Company.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the Court.

Two separate complaints were filed in the district court of the City and County of Denver against the Oil and Gas Conservation Commission of the State of Colorado, the individual members thereof, and the State Oil

and Gas Inspector. In both cases Phillips Petroleum Company, the California Company and Stanolind Oil and Gas Company were allowed to intervene as defendants, and thereafter the two cases were consolidated for trial and were tried as one case. The Sharples Oil Corporation was plaintiff in one of the actions, and Union Pacific Railroad Company and the Texas Company were plaintiffs in the other. The trial court referred to the parties as though one case was being considered in which Sharples, Union Pacific and the Texas Company were plaintiffs, and the Commission, its individual members, the State Oil Inspector, and the three intervening companies were defendants. In this opinion we will refer to the parties in that manner.

Plaintiffs sought to enjoin the enforcement of orders entered by the Commission. The trial court found all issues in favor of defendants and entered judgment dismissing plaintiffs' complaints. Plaintiffs, seeking reversal of the judgment, bring the case to this Court by writ of error.

The subject matter of the litigation is the Rangely Oil Field located in the Rio Blanco county, Colorado. The six corporate entities involved as parties in this action operate the field and control all of the land except 207 acres thereof, and operate all of the wells in the field except five. These five wells are not involved in the present action. The proportion in which the various companies operate and control the field and the number of wells owned by each are as follows:

California Company, 8160.72 acres, 205 wells.

Stanolind, 4716.30 acres, 115 wells.

Texas-Union Pacific, 3540.00 acres, 89 wells.

Phillips Petroleum Co., 1918.61 acres, 48 wells.

Sharples Corporation, 653.04 acres, 16 wells.

Defendant Oil and Gas Conservation Commission of Colorado was created by Act of the legislature in 1951, and one of the first activities undertaken upon its creation was directed toward the conservation of oil and gas

in the Rangely Field. Many hearings were held before the Commission and many expert witnesses, most of whom appeared thereafter in the trial court in this action, testified before the Commission. These hearings were started in the autumn of 1951 and were not concluded until May 1952. June 20, 1952, the Commission issued its order, No. 2-8, and it is this order, and particularly Rule 3-b thereof that forms the subject matter of this controversy. Said Rule 3-b is as follows:

"On and after January 1, 1953, no gas shall be produced from the Weber Sand Reservoir unless all gas so produced shall be returned to said reservoir; provided, however, that the provisions of this paragraph shall not apply to gas required for lease development or operations, gas used as fuel or represented by shrinkage in gasoline plant or gas injection operations, and gas required to supply domestic or municipal needs in the immediate vicinity of the Rangely Field."

At the time of the entry of the order of which plaintiffs complained, approximately two-thirds of all the oil produced in Colorado came from the Weber Sand Reservoir in the Rangely Field. The surface area embraced is approximately 20,000 acres in which there are 478 producing wells with an aggregate daily flow of about 60,000 barrels of oil. These wells produce about 39 milmion cubic feet of gas daily, of which 20 million cubic feet was being flared in the open air each day. The purpose of the gas reinjection program ordered by the Commission is to prevent dissipation of the energy inherent therein as the force necessary to the production of oil, and is illustrated by the following testimony of one of the experts:

"Oil does not produce itself out of the reservoir rock into the wells. Rather, oil must be pushed out of the rock into the wells. Generally, nature provides two ways for pushing the oil out of the rock into the wells. One way, which is typical and characteristic of the Weber sand, is that the oil is pushed from the rock into wells

by natural gas. Were it not for the presence of natural gas under pressure along with the oil within the body of the rock, there would be no oil production from the Weber sand, even though there might be oil itself in the rock. The fact is that crude oil is a dead and inactive substance. It will move only if it is pushed; and the expelling agent in this instance, in the Weber sand, is gas. It follows, then, without contest, that if there is no pressure or gas in the Weber sand, then there can be no oil production. It also follows, conversely, that there will be oil production only so long as there is gas pressure."

When the first well was completed into the Weber sand the gas pressure, called bottom-hole pressure, was 2750 pounds per square inch. At the trial in February, 1953, the average bottom-hole pressure in the field was said by one of the experts to be 1340 pounds per square inch. It is obvious that when the gas pressure decreases to a point where it will not cause oil to flow into the wells no more oil can be produced from the field under primary recovery methods, and secondary methods must be employed if production from the field is to continue.

The experts all agree that only a percentage of the oil in place can be recovered no matter what methods for production are employed, and their estimates for recovery under normal primary production procedure varied from 17% to 21.4%. If the lowest estimates of total oil in place and percentage of recovery under primary production methods be used, simple calculation will show that when the field no longer is capable of producing oil under primary methods there will be left in the Weber sand one billion one hundred and sixty-two million barrels of oil. The recovery of some of this oil is the principal object and purpose of the orders of the Commission. The amount of oil which it is believed can be recovered by compliance with the orders of the Commission, and which otherwise would remain in the ground, is variously estimated by defendants' expert witnesses to be between 30 million and 87 million barrels.

Pertinent provisions of the statute creating the Commission and fixing its powers are, as quoted from chapter 230, Session Laws of Colorado 1951, as follows:

"Section 1.  The waste of oil and gas or either of them in the State of Colorado as in this Act defined is hereby prohibited.

\*     \*     \*

"Section 4.  The term 'waste' as applied to oil shall include underground waste, inefficient, excessive or improper use or dissipation of reservoir energy, including gas energy and water drive, \* \* \*.

"Section 5.  The term 'waste' as applied to gas shall include the escape, blowing or releasing, directly or indirectly, into the open air of gas from wells productive of gas only, or gas in an excessive or unreasonable amount from wells producing oil or both oil and gas; and the production of gas in quantities or in such manner as will unreasonably reduce reservoir pressure or unreasonably diminish the quantity of oil or gas that might ultimately be produced; excepting gas that is reasonably necessary in the drilling, completing, testing, and in furnishing power for the production of wells.

\*     \*     \*

"Section 7.  (a) The Commission shall have and is hereby given jurisdiction and authority over all persons and property public and private necessary to enforce the provisions of this Act and shall have the power and authority to make and enforce rules, regulations and orders pursuant to this Act, and do whatever may reasonably be necessary to carry out the provisions of this Act. Any delegation of authority to any other state officer, Board or Commission to administer any and all other laws of this state relating to the conservation of oil or gas or either of them, is hereby rescinded and withdrawn and such authority is hereby unqualifiedly conferred upon the Commission, as herein provided. \* \* \*

\*     \*     \*

"Section 12.  (a) An agreement for repressuring or

pressure-maintenance operations, cycling or recycling operations, including the extraction and separation of liquid hydrocarbons from natural gas in connection therewith, or for carrying on any other methods of unit or cooperative development or operation of a field or pool or a part of either, is authorized and may be performed, and shall not be held or construed to violate any statutes relating to trusts, monopolies, or contracts and combinations in restraint of trade, if the agreement is approved by the Commission as being in the public interest for conservation or is reasonably necessary to increase ultimate recovery or to prevent waste of oil or gas. Any such agreement heretofore entered into for any such purpose is hereby approved. Such agreement shall bind only the persons who execute them, and their successors in interest.

"(b) Whenever the producers have agreed, or the producer in such field where there is only one producer, has adopted a plan for the development and operation of a pool or field, such plan shall be presented to the Commission, and if the same, in the judgment of the Commission, after a hearing, upon notice, has the effect of preventing waste as defined and prohibited by this Act, then such plan shall be adopted and approved by the Commission.

\* \* \*

"Section 14. This Act shall never be construed to require, permit or authorize the Commission or any court to make, enter, or enforce any order, rule, regulation or judgment requiring restriction of production of any pool or of any well (except a well or wells drilled in violation of Section 6 hereof), to an amount less than the well or pool can produce without waste in accordance with sound engineering practices."

Counsel for plaintiffs state that the fundamental issue involved in this proceeding is: Did the legislature in the Act delegate to the Commission power and authority to promulgate Rule 3? Their contention is that no such

power was delegated. The argument is divided into six points as follows:

"First, that since the Act prohibits only the production of 'gas in an *excessive* or *unreasonable* amount from wells producing oil or both oil and gas; and the production of gas in quantities or in such manner as will *unreasonably* reduce reservoir pressure or *unreasonably* diminish the quantity of oil or gas that might ultimately be produced,' the Act plainly recognizes the right of an operator to produce with his oil and to vent into the air reasonable quantities of gas, with the consequence that the Commission has no power to prohibit entirely the venting of gas produced by an operator with his oil.

"As originally enacted, the Act could have been interpreted as prohibiting the venting of *any* gas from wells producing both oil and gas, but in 1952 the legislature, in order to fully protect the rights of operators and to eliminate any question about the matter, amended the statute so as to *limit* the prohibition to the venting of an 'excessive or unreasonable amount' of gas from wells producing both oil and gas.

"Second, that the Act quite plainly prohibits certain condemned practices in the production of oil and gas and confers upon the Commission the authority to enforce such prohibitions, but the Act goes no further and in no way confers upon the Commission the power by mandate to compel an operator, under threat of closing down his operations entirely, to take *affirmative* action by preparing or drilling wells for gas injection, by installing very costly compressor equipment, expensive pipe lines and taking other steps essential to gas injection, expenditures which the operators would avoid, in the absence of economic justification, convincing to themselves.

"Third, that authority on the part of the Commission to enter such a drastic and far-reaching order, as is Order No. 2-8, requiring the expenditure of millions of dollars by the operators so that *all* gas produced by them may be reinjected into the reservoir, may not be sup-

ported by implication but must be supported by language plainly and unambiguously granting such broad power, language not found in this Act.

"Fourth, that any operation under which all gas produced from the Weber sand by all operators is reinjected into said sand, to be successful and in order to protect the property rights of the operators, requires unitization of the field; that is, operations of the Field as a unit, a result that the operators have not been able to achieve and that the Commission has not been authorized by the Act to compel; and that this very failure on the part of the Legislature to confer such authority upon the Commission conclusively shows that the Legislature never intended to give the Commission the power to compel operators to reinject their produced gas.

"Fifth, that to interpret the Act as conferring upon the Commission by implication the power and authority to compel operators to reinject all produced gas would render the Act unconstitutional, since it contains no statement of standards to govern the Commission in so drastically regulating operations in the Field.

"Sixth, that it is plain from the language of the Act that the Commission has not been authorized to prohibit the sale of gas by an operator, which the Commission has done by requiring each operator to reinject all its produced gas, except that consumed on the lease or locally."

Question to be Determined.

■ *Under the delegation of authority contained in chapter 230, Session Laws of Colorado, 1951, as amended by chapter 50, Session Laws of Colorado, 1952, has the Commission the power and authority to promulgate Rule 3 (b) hereinabove quoted?*

The question is answered in the negative. All parties to this action admit that the legislature has the power to legislate in the field of conservation of so vital a natural resource as oil and gas. All parties to this action admit, also, that the legislature has the power to delegate to the

Commission of its creation certain powers and authority with reference to the administration of any legislation in this field. The extent of these powers so delegated to the Commission is the real issue, which we determine not to be sufficient to authorize or support the order of the Commission here involved.

At common law there was, of course, no Commission; the Commission is a creature of statute, and its authority and power is limited by the statute. It is the particular statute under consideration which leads us to the conclusion here announced, and reference to dissimilar Acts prevailing in other jurisdictions is futile. The provisions of the Act creating the Commission prohibits waste as in the statute defined. It does not prohibit all waste, but only *defined* waste. Waste is defined in sections 4 and 5 of the Act. Nowhere in the definition of waste under sections 4 or 5, as amended, can there be found any authority for the order herein involved. The definition of waste in section 4 includes the words "inefficient, excessive or improper use of reservoir energy, including gas energy and water drive." The prohibition is with respect to the "use or dissipation" of gas energy. Nothing is said about restoring such energy after it has been used, as is required by the Commission in its order.

Under section 5, as amended, there is the definition of waste of gas as "the escape, blowing or releasing, directly or indirectly, into the open air of gas from wells productive of gas only; or gas in an *excessive* or *unreasonable* amount from wells producing oil, or both oil and gas, and the production of gas in quantities in such manner as will *unreasonably* reduce reservoir pressure or *unreasonably* diminish the quantity of oil or gas that might ultimately be produced." It is immediately apparent that some gas escape or release is permitted; that only excessive or unreasonable amounts are prohibited.

It is important to observe the distinction made in section 5, as amended, between gas produced from a gas well and gas produced with the oil from an oil well.

No provision is made for the flaring of *any gas* produced from a gas well, but as to a well producing oil, or both oil and gas, the prohibition is only against the flaring of an *"excessive or unreasonable amount."* This language clearly shows that the Commission had the authority to *limit* the flaring of gas, but not entirely forbid it.

The order of the Commission is not limited to excessive or unreasonable gas production from a well, which might have a high oil-gas ratio. It goes further and requires the reinjection of *all* gas to the reservoir. It is not limited in its operation to production in a wasteful manner under primary methods of production. It affirmatively requires the operators to participate in and expend their money, time and efforts in connection with a gas injection program which is a secondary recovery mechanism. Nowhere in the Act, and by no interpretation of the powers granted by the Act, is the Commission given power to make affirmative orders having the effect of requiring the operators to participate in a plan for gas injection or a secondary recovery mechanism.

The above is amply supported by the legislative history of the oil and gas conservation laws in the State of Colorado. In 1915 the legislature passed an Act relating to oil wells and their effect upon coal seams and coal mines, and referred to the waste of oil or gas from a well in the following language:

"Sec. 29. It shall be unlawful for any person or corporation having possession or control of any natural gas or oil well whether as contractor, owner, lessee, agent or manager, to allow or permit the flow of gas or oil, from any such well to escape into the open air, but shall use due diligence to confine such gas or oil in such well or pipes or other safe and proper receptacles, or shall put the same to some beneficial use." S.L. Colo. 1915, p. 374.

Thereafter, in 1927, the legislature created a Gas Conservation Commission, which was the predecessor to the Oil and Gas Conservation Commission whose order is here involved; and again defined waste as, "Section 1.

The unavoidable waste or wasteful use of any gas hereafter produced in the State of Colorado, whether the same be natural gas from gas wells, or casing head gas from oil wells, is hereby prohibited and declared to be unlawful." S. L. Colo. 1927, p. 525. The next legislation was by the 1929 legislature, giving the Gas Conservation Commission authority to prescribe rules and regulations for plugging wells. S. L. Colo. 1929, p. 484, chapter 137.

The amendment of section 5 of the 1951 Act, to be found in the 1952 Session Laws of Colorado at page 132, is an additional limitation upon the power of the Commission, in that flaring of gas is not entirely forbidden. The flaring of such amounts of gas as will not unreasonably diminish the amount of oil or gas that might be produced, is expressly allowed. It immediately is apparent that delegation of authority by the legislature to the Gas Commission, or the Oil and Gas Conservation Commission, has been stintingly, sparingly, and almost grudgingly granted.

That the legislature was informed and cognizant of the possibility of secondary recovery mechanisms, is clear when we consider the presence of section 12 in the 1951 Act, which expressly recognizes the possibility of "repressuring or pressure-maintenance operations, cycling or recycling operations, including the extraction and separation of liquid hydrocarbons from natural gas in connection therewith, or for carrying on any other methods of unit or cooperative development or operation of a field or pool or a part of either, is authorized and may be performed. * * *" The Act under consideration, by said section 12, placed such "repressuring or pressure-maintenance operations" on a purely voluntary basis, clearly demonstrating that it was not the intention of the legislature to grant to the Commission the power to accomplish secondary recovery through its compulsory orders.

We recognize that there may be great advantages to the operators and substantial additional recovery of

oil in the Rangely Field if repressuring secondary recovery mechanisms are adopted. We also appreciate the fact that substantial benefits might accrue to the operators in the field and to the State of Colorado if unitization of Rangely Field were to be accomplished. Under section 12 of the 1951 Act, either or both of these objectives might be had by voluntary agreements between the operators. A valid compulsory program to accomplish those ends must have definite authorization from the legislature. Assuming that the result sought by the order of the Commission is one which the legislature has the power to bring about by proper enactment, the Act in question did not accomplish that result by its specific terms, nor did it delegate power to the Commission to promulgate the order which forms the basis of this dispute. *Dobson v. Oil & Gas Comm. of Arkansas, et al,* 218 Ark. 160, 235 S.W. (2d) 33; *Carter Oil Company v. State,* 205 Okla. 541, 240 P. (2d) 787; *Republic Natural Gas Co. v. Baker,* 197 Fed. (2d) 647. Whether the purposes sought to be accomplished by that order shall be carried out is a question for the legislature to determine, and this Court has been constitutionally forbidden to enter into this field.

The Colorado cases cited by both plaintiffs and defendants are entirely consistent with the conclusion here announced, and with each other. They hold that, assuming the legislature under its police power has the right to delegate authority to a commission, the commission may act only within the authority delegated by the legislature under standards clearly fixed by the law, leaving no discretion in the Commission to declare what the law is. *Prouty v. Heron,* 127 Colo. 168, 255 P. (2d) 755; *People ex rel. v. Colorado Title & Trust Company,* 65 Colo. 472, 178 Pac. 6; *Ziegler v. People,* 109 Colo. 252, 124 P. (2d) 593.

The Colorado Oil and Gas Conservation Commission having entered its Order 3 (b) without authority, said order was, and is, void and of no force and effect. The

judgment of the trial court, approving the action of the Commission, was erroneous, and said judgment therefore is reversed and the cause remanded with instructions to enter judgment for plaintiffs, as prayed.

Mr. Justice Clark not participating.