IN RE APPLICATION OF FARMERS IRRIGATION DISTRICT AND SUN OIL COMPANY FOR ENTRY OF A COMPULSORY POOLING ORDER AS TO PRODUCTION FROM GOVERNMENT LOT 3, SECTION 18, TOWNSHIP 22 NORTH, RANGE 53 WEST OF THE 6TH P.M., SCOTTS BLUFF COUNTY, NEBRASKA, IN THE NORTH MINATARE FIELD.
FARMERS IRRIGATION DISTRICT ET AL., APPELLANTS, V. LEO SCHUMACHER ET AL., APPELLEES.

194 N. W. 2d 788

Filed February 18, 1972. No. 37956.

Robert J. Bulger, for appellants.

Lyman & Meister, Howard P. Olsen, and Frank Glebe, for appellees.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

NEWTON, J.

This case arises out of an application of the appellants, Farmers Irrigation District et al., to the Nebraska Oil and Gas Conservation Commission for entry of a compulsory pooling order as to oil production from Government Lot 3, Section 18, Township 22 North, Range 53 West of the 6th P.M., Scotts Bluff County, Nebraska, located in what is known as the North Minatare Field. The application was filed January 16, 1967, and asks that the pooling order be made retroactive to October 15, 1964, the date of commencement of production from a well, known as the White Feather Petroleum Company, Inc., Emery No. 2, drilled on Government Lot 3. The commission entered a pooling order; determined the allocation between the two separate leases which cover a separate portion of Government Lot 3; made the allocation effective as to all production subsequent to October 15, 1964; and charged the working interest owners in the two leases with their allocated shares of all drilling completion, storage, supervision, transportation, and other costs necessary to the well. The appellees appealed to the district court for Scotts Bluff County, which court after trial reversed the order of the commission and determined that the Farmers Irrigation District and its lessee, Sun Oil Company, did not prove the facts

and allegations contained in their application to the commission and that any minerals owned by the Farmers Irrigation District and its lessee "cannot be pooled." We reverse the judgment of the district court and remand the cause with directions to the district court to affirm the order of the commission.

The Farmers Irrigation District is the owner of a strip of land 150 feet wide extending across the south part of Government Lot 3. This strip appears to contain approximately 4.19 acres. Sun Oil Company holds an oil and gas lease covering this tract. No well was drilled thereon. The appellees, other than White Feather Petroleum Company, Inc., are the owners of the balance of Government Lot 3, containing about 43.92 acres. White Feather is the holder of the oil and gas lease on that tract. White Feather drilled a producing well in the approximate center of Government Lot 3 which became productive about October 15, 1964. On about December 22, 1964, Sun gave notice to White Feather and others of its lease and claimed a proportionate share of the production from the Emery No. 2 well. Appellees then disputed ownership of appellants' land and thereby questioned their right to any of the oil produced. This resulted in the filing of an action on August 27, 1965, to determine ownership of the land. The action was decided in favor of appellees and reversed on appeal to this court. See Sun Oil Co. v. Emery, 183 Neb. 793, 164 N. W. 2d 644, decided January 31, 1969. Proceeds of production from the well have been held back and distribution awaits the outcome of this litigation.

Two questions are presented. First, were the interests of the parties subject to "pooling"? Second, may the pooling order be made effective retroactively to the date production commenced?

A determination of these questions will require a determination of the purpose and intent of the Oil and Gas Conservation Act found in Chapter 57, article 9, R. R. S. 1943. The act was adopted in 1959. See Laws

1959, c. 262, p. 899. Discussions of the act on the floor of the Legislature are not available, but a transcript of the proceedings before the Committee on Public Works reveals statements made by E. C. Reed, State Geologist, and Ken Monroe, representative of the oil industry. Both supported the act. When asked for a definition of correlative rights, they answered as follows: "Mr. Reed: It is about the only thing that is going to give the landowner any degree of protection. It is open to different interpretations. It has to do with the protection of each man's rights as opposed to another's rights in a fair consideration of the rights of everyone. You are not protecting correlative rights if you let one producer take oil out from under the adjoining person's land indiscriminately.

"Mr. Monroe: It all goes back to the early days of the oil industry when the law of capture was the way you operated an oil field. It was soon learned that this was infringing on the rights of others who had a mutual interest in this field. Correlative rights means 'mutual interest.' "

It is clear that the Legislature understood the protection of "correlative rights," as provided in the act, meant a restriction of the old common law rule of "capture." To ascertain to what extent this was done requires a detailed consideration of the language contained in the act. It must also be borne in mind that under the law of capture, there were no restraints on the drilling of wells. He who drilled was entitled to the oil produced. To protect himself, a neighbor under whose land the pool extended had to, and could, drill his own well.

Referring now to the various sections of Chapter 57, article 9, R. R. S. 1943, we find certain pertinent provisions. Section 57-901, R. R. S. 1943, provides: "It is hereby declared to be in the public interest to foster, to encourage and to promote the development, production and utilization of natural resources of oil and gas in the state in such a manner as will prevent waste; to au-

thorize and to provide for the operation and development of oil and gas properties in such a manner that the greatest ultimate recovery of oil and gas be had; *and that the correlative rights of all owners be fully protected;* * * *.

"It is the intent and purpose of sections 57-901 to 57-921 to permit each and every oil and gas pool in Nebraska to be produced up to its maximum efficient rate of production, subject to the prohibition of waste as herein defined *and subject further to the enforcement and protection of the correlative rights of the owners of a common source of oil or gas so that each common owner may obtain his just and equitable share of production therefrom.*"   (Emphasis supplied.)

Section 57-902, R. R. S. 1943, prohibits waste and section 57-903, R. R. S. 1943, defines one form of waste as follows:  "* * * waste shall also mean the abuse of the correlative rights of any owner in a pool due to nonuniform, disproportionate, unratable *or excessive withdrawals of oil or gas therefrom causing reasonably avoidable drainage between tracts of land or resulting in one or more owners in such pool producing more than his just and equitable share of the oil or gas from such pool;* * * *." (Emphasis supplied.)   This section also defines correlative rights as follows:  "Correlative rights shall mean the opportunity afforded to the owner of each property in a pool to produce, so far as it is reasonably practicable to do so without waste, *his just and equitable share of the oil or gas, or both, in the pool;* * * *." (Emphasis supplied.)

Section 57-905 (4), R. R. S. 1943, confers authority on the Oil and Gas Conservation Commission to prevent waste and to regulate the drilling, producing, and spacing of wells.

Section 57-906, R. R. S. 1943, requires a permit from the commission before a well may be drilled.

Section 57-907, R. R. S. 1943, authorizes the commission to limit the production of oil and gas from each

pool to an amount that can be produced without waste and further provides: "Whenever the commission limits the total amount of oil and gas which may be produced in any pool in this state to an amount less than that amount which the pool could produce if no restriction was imposed, the commission shall allocate or distribute the allowable production among the several wells or producing properties in the pool on a reasonable basis, preventing or minimizing reasonably avoidable drainage from each developed area not equalized by counter-drainage, *so that each property will have the opportunity to produce or to receive its just and equitable share,* subject to the reasonable necessities for the prevention of waste." (Emphasis supplied.)

Section 57-908, R. R. S. 1943, provides: "(1) When required to prevent waste, to avoid the drilling of unnecessary wells, *or to protect correlative rights,* the commission shall establish spacing units for a pool, * * *. (2) The size and the shape of spacing units are to be such as will result in the efficient and economical development of the pool as a whole, and that size shall be the area that can be efficiently and economically drained by one well. (3) * * * the commission *shall include in the order suitable provisions to prevent the production from the spacing unit of more than its just and equitable share of the oil* and gas in the pool." (Emphasis supplied.)

Section 57-909, R. R. S. 1943, provides: "(1) When two or more separately-owned tracts are embraced within a spacing unit, * * * the commission * * * shall be empowered to enter an order pooling all interests in the spacing unit * * *. Each such pooling order * * * shall be upon terms * * * *that are just and reasonable,* and that afford to the owner of each tract or interest in the spacing unit the *opportunity to recover or receive,* * * *, his just and equitable share.* Operations incident to the drilling of a well upon any portion of a spacing unit covered by a pooling order shall be deemed, *for all purposes, the conduct of such operations upon each sepa-*

*rately-owned tract* in the drilling unit by the several owners thereof. That portion of the production allocated to each tract * * * shall, when produced, be *deemed for all purposes to have been produced from such tract by a well drilled thereon."* (Emphasis supplied.) This section also provides sharing of the expense of drilling and producing.

In conformity with the authority conferred on it by section 57-911, R. R. S. 1943, the commission adopted Rule 313, subsection (b) of which is as follows: "All wells drilled to sources of supply at estimated depths in excess of two thousand five hundred (2500) feet for which no spacing pattern has been established by existing wells shall be drilled *on 40-acre legal subdivisions or equivalent lots* and not less than five hundred (500) feet from the boundaries of said legal subdivisions." (Emphasis supplied.)

The pooling order requiring a pooling of the interests of appellants and appellees was entered in conformity with the requirements of the act and under the authority expressly conferred in sections 57-908 and 57-909, R. R. S. 1943, and allocated production as therein directed. We conclude that the pooling order was valid and enforceable.

The primary question is the second mentioned. Can the order allocating production be made retroactive to the date production commenced? Under the common law rule of capture, appellees would have been entitled to all oil produced and appellants only remedy would have been to drill its own well. With the adoption of the Oil and Gas Conservation Act, a landowner could no longer so protect his interest. It became necessary to get a drilling permit and the act contemplates that there shall be only one well if that one can adequately pump out the oil in the pool. Here the appellants are entirely dependent for protection on the pooling order allocating to them a share in the production and the costs of production of appellees' well. The several sections of the

act consistently stress the protection of correlative rights. They are clearly designed to protect adjoining landowners under whose lands a pool may extend. To do so in a fair, reasonable, and adequate manner, and to permit an adjoining owner to obtain, recover, and receive his just and equitable share, the pooling order may be made retroactive to the time production started and, insofar as costs are concerned, to the start of drilling operations. Unless the order may be made effective retroactively, it may on occasion verge on the confiscatory.

We do not mean to say that this should be done in every instance. All pertinent factors affecting the particular case under review must be considered. There is ordinarily no good reason why an adjoining owner should not ask for a voluntary pooling agreement at the time his neighbor starts to drill and thereby share in the expense, as well as in production, whether or not the well proves successful. The statutes clearly intend that rights shall be resolved upon an equitable basis. To permit an adjoining owner to sit back and await the successful outcome of drilling operations without asking for a pooling agreement would place the entire risk and the entire expense upon the party drilling in the event of an unsuccessful operation. This would ordinarily be inequitable and not justify a retroactive order. Section 57-909, R. R. S. 1943, contemplates that when an adjoining owner fails to enter into a voluntary pooling agreement, a spacing and pooling order may be entered on the application of any interested party. The drilling party may recover the share of the expense allocated to the adjoining owner by deducting it from the adjoining owner's share of the oil or gas produced. This enhances the risk taken by the drilling party who may encounter a dry well and is a factor which must also be considered in weighing equities. In this case, due to the early notice of a claim to pooling rights given appellees by appellants, and to the obvious delaying tactics pursued by

appellees, although proceedings before the commission were not commenced as early as they might have been, we are inclined to believe that limiting the pooling order to the date of commencement of such proceedings is not justified and that the order should be made retroactive at least to the date notice of appellants' claim was given. This occurred very soon after completion of the well and in view of the fact that the commission's order allocated drilling, as well as production expense, to appellants, we find the order to be fair and equitable. We direct that such order be reinstated and adhered to. The judgment of the district court is reversed and the cause remanded with directions to enter judgment as herein directed.

REVERSED AND REMANDED WITH DIRECTIONS.

CLINTON, J., dissenting.

I believe the majority opinion is seriously erroneous in several important particulars, some of which I will enumerate forthwith. (1) It misreads, misinterprets, and misapplies the "pooling" provision of the Oil and Gas Conservation Act and disregards and seems to make inapplicable the statutory requirement of establishment of "spacing units" as a precondition for pooling. (2) It ignores and permits the commission to ignore that body's own rules with reference to the establishment of "spacing units." (3) It apparently replaces the spacing unit determination called for by the statute with a privately given "notice of claim." (4) It takes from the owner proceeds of oil lawfully produced from the owner's well and gives it to another under the guise of "pooling" all contrary to well-established and fundamental principles of oil and gas property law. 58 C. J. S., Mines and Minerals, §§ 134 a, (2), b, pp. 213, 215, 218. (5) It violates fundamental principles of property law pertaining to ownership of oil and gas heretofore announced by this court and which have become rules of property law. (6) It creates confusion by using the term "pool" which is defined in the statute, when it

should be referring to "spacing unit." A pool is the reservoir. § 57-903(6), R. R. S. 1943. A spacing unit is that portion of the pool (established by act of the commission after hearing) which can be drained by one well and the production of which is to be shared where there exists separate ownership of tracts within the spacing unit. (7) It interprets the oil and gas act—or I presume the rule requiring the permit to drill—as preventing an owner of oil and gas from protecting his interests by drilling a well to prevent drainage. This is nonsense. See commission Rules 303 and 313(d). Permits are granted administratively and routinely, and where required unorthodox location hearings are one of the most common types of hearing. The commission cannot arbitrarily deny a permit despite the apparent implication in the majority opinion. (8) It cites no authority for its interpretation of the act and ignores respectable and weighty authority from other jurisdictions. (9) It ignores some of the issues raised by the parties.

The effect of the opinion will be to create confusion in the oil and gas industry insofar as the industry is involved with the sections of the statutes discussed in the opinion. I believe that the best way to attempt to lessen the confusion and point out errors in the majority opinion is to write an opinion as I believe it should be. This I now do.

This case arises out of an application of the appellants, Farmers Irrigation District et al., to the Nebraska Oil and Gas Conservation Commission for entry of a compulsory pooling order as to oil production from Government Lot 3, Section 18, Township 22 North, Range 53 West of the 6th P.M., Scotts Bluff County, Nebraska, located in what is known as the North Minatare Field. The application was filed January 16, 1967, and asks that the pooling order be made retroactive to October 15, 1964, the date of commencement of production from a well, known as the White Feather Petroleum Company, Inc., Emery No. 2, drilled on Government Lot 3. The com-

mission entered a pooling order; determined the allocation between the two separate leases which cover separate portions of Government Lot 3; made the allocation effective as to all production subsequent to October 15, 1964; and charged the working interest owners in the two leases with their allocated shares of all drilling completion, storage, supervision, transportation, and other costs necessary to the well. The appellees appealed to the district court for Scotts Bluff County, which court after trial reversed the order of the commission and determined that the Farmers Irrigation District and its lessee, Sun Oil Company, did not prove the facts and allegations contained in their application to the commission and that any minerals owned by the Farmers Irrigation District and its lessee "cannot be pooled." I would reverse the judgment of the district court and remand the cause with directions to the district court to remand to the commission for further proceedings not inconsistent with this dissenting opinion.

The Farmers Irrigation District is the owner of a strip of land 150 feet wide extending across the south part of Government Lot 3. This strip appears to contain approximately 4.19 acres. Sun Oil Company holds an oil and gas lease covering this tract. No well was drilled thereon. The appellees, other than White Feather Petroleum Company, Inc., are the owners of the balance of Government Lot 3, containing about 43.92 acres. White Feather is the holder of the oil and gas lease on that tract. White Feather drilled a producing well in the approximate center of Government Lot 3 which became productive about October 15, 1964. On about December 22, 1964, Sun gave notice to White Feather and others of its lease and claimed a proportionate share of the production from the Emery No. 2 well. Proceeds from production were apparently thereafter held in suspense and distribution awaited ultimate outcome of this and other litigation.

Farmers and Sun base their claim of right to a retro-

active pooling order upon application of subsection (b) of Rule 313 of the commission. Rule 313 is entitled "LOCATION OF WELLS." Subsection (b) reads as follows: · "All wells drilled to sources of supply at estimated depths in excess of two thousand five hundred (2500) feet for which no spacing pattern has been established by existing wells shall be drilled *on 40-acre legal subdivisions or equivalent lots* and not less than five hundred (500) feet from the boundaries of said legal subdivisions." (Emphasis supplied.)

The appellants contend that this rule establishes a spacing unit or drilling unit for the purposes of sections 57-908 and 57-909, R. R. S. 1943. The appellees contend that since the rules of the commission were not introduced into evidence in the trial court neither that nor this court can take notice of the commission rules. I would reject both contentions. Some of the appellees also take the position that Rule 313(b) does not have the effect of establishing a spacing unit for a pool or a portion thereof. As already indicated, I think this is correct.

For the reasons I set forth hereafter, I would hold that the trial court and this court can and should take judicial notice of the general rules of the commission provided they are properly adopted and promulgated. Section 57-911(5), R. R. S. 1943, is in part as follows: "All rules, regulations and orders issued by the commission shall be in writing, shall be entered in full and indexed in books to be kept by the commission for that purpose, and shall be public records open for inspection at all times during reasonable office hours and shall be filed as provided by Chapter 84, article 9." Section 84-906, R. R. S. 1943, provides in part as follows: "No rule required under this act to be filed with the Secretary of State shall be valid as against any person until the certified copy of the rule shall have been so filed; and, unless otherwise specifically provided by law, such filing of any rule shall, except where notice by publica-

tion is insufficient in law, *be sufficient to give notice of the contents of such rule to any person subject thereto or affected thereby."* (Emphasis supplied.)

"In ascertaining matters of fact or of law to be judicially noticed, the judge may resort to, or obtain information from, any source of knowledge which he feels would be helpful." 31 C. J. S., Evidence, § 12, p. 833. My investigation discloses that the rules were adopted and filed in conformity with the statutes. The original rules of which Rule 313 (b) is a part were filed and approved in accordance with Chapter 84, article 9, R. R. S. 1943, on January 12, 1960. This court has long taken judicial notice of properly promulgated regulations of federal administrative agencies. Larson v. First National Bank, 66 Neb. 595, 92 N. W. 729; Powell v. Anderson, 147 Neb. 872, 25 N. W. 2d 401; 31 C. J. S., Evidence, § 39, p. 978. No different rule should apply to the regulations of our own state administrative agencies. The statute cited would appear to make it mandatory. "State courts may take judicial notice of the rules and regulations of the various departments of the state government." 31 C. J. S., Evidence, § 39, p. 980. The general rules of the commission properly adopted and filed in accordance with the foregoing statutes are legislative facts of which judicial notice may be taken. State v. Freeman (Okla.), 440 P. 2d 744; H. F. Wilcox Oil & Gas Co. v. State, 162 Okla. 89, 19 P. 2d 347, 86 A. L. R. 421.

I now examine the contention of the appellants that the adoption of Rule 313 (b) had the effect of establishing a spacing unit by virtue of which the appellants were, under the compulsory pooling order of the commission entered on June 22, 1967, entitled to share in the production from the Emery No. 2 well as of the date of first production. This question requires an examination of the Oil and Gas Conservation Act. One of the underlying purposes of the act is "enforcement and protection of the correlative rights of the owners of a common source of oil or gas so that each common

owner may obtain his just and equitable share of production therefrom." § 57-901, R. R. S. 1943. The act also prohibits waste which includes the abuse of the correlative rights of any owner. §§ 57-903, 57-908, R. R. S. 1943. Section 57-905(4)(c), R. R. S. 1943, grants authority to the commission to regulate "the spacing of wells." Section 57-905(7), R. R. S. 1943, gives the commission the authority to promulgate and enforce rules and regulations to effectuate the purposes of the act.

Sections 57-908 and 57-909, R. R. S. 1943, are the sections which pertain to the establishment of "spacing units" and the "pooling of interests." The first-mentioned section provides that to prevent waste, to avoid the drilling of unnecessary wells, or to protect correlative rights the commission shall establish spacing units for a pool, which units are to be of substantially uniform size and shape for the entire pool. The size and shape may vary in different zones of the pool as established by the commission. A spacing order must specify the size and shape of each unit and the location of the well. Rule 338 of the commission is as follows: "The Commission may upon its own motion or upon the motion of any interested party *and after notice and hearing* establish spacing units of a specified and approximate uniform size and shape for each pool within this State." (Emphasis supplied.)

Section 57-909, R. R. S. 1943, provides that when two or more separately owned tracts are embraced within a spacing unit, their owners may voluntarily pool their interests and, in the absence of voluntary pooling, authorizes the commission upon application or on its own motion to enter an order for the pooling of interests in the unit. This section states in part: "Each such pooling order shall be made only after notice and hearing, and shall be upon terms and conditions that are just and reasonable, and that afford to the owner of each tract or interest in the spacing unit the opportunity to

recover *or receive*, without unnecessary expense, his just and equitable share. . . . Each such pooling order shall make provision for the drilling and operation of *the authorized well* on the spacing unit, and for the payment of the reasonable actual cost thereof, including a reasonable charge for supervision. As to each owner who refuses to agree upon the terms for drilling and operating the well, the order shall provide for reimbursement for his share of the costs out of, and only out of, production from the unit representing his interest, excluding royalty or other interest not obligated to pay any part of the cost thereof." (Emphasis supplied.) It is not necessary for the purposes of this opinion to refer to other provisions of this section.

The above statutes make it clear that Rule 313(b) does not and could not establish "spacing units" for the various producing pools in the state. It appears to be merely a well location rule under section 57-905(4)(c), R. R. S. 1943. Section 57-908, R. R. S. 1943, obviously contemplates an order establishing spacing units for "a pool," not one general order establishing uniform units for all pools in the state known and unknown. Rule 338 of the commission, which I have previously quoted, recognizes this obvious statutory intention. An administrative agency is bound by its own rules. 73 C. J. S., Public Administrative Bodies and Procedure, § 107, p. 428.

In Carter Oil Co. v. State, 205 Okla. 541, 240 P. 2d 787, the Supreme Court of Oklahoma had before it a rule similar to Rule 313(b). It there held that such a rule did not establish a "spacing unit," but merely established the location of a drilling site, and said: "Unit lines must be established by a proper procedure." The pertinent portions of the Oklahoma statutes are sufficiently similar to our own to make the above case valuable as a precedent.

There is, however, another reason why I could not interpret Rule 313(b) as contended for by the appel-

lants and still uphold its validity. The commission has been granted by the Legislature both legislative and quasi-judicial or adjudicatory powers. In adopting rules it acts legislatively. It need give public notice only to the extent the statute requires it. 1 Am. Jur. 2d, Administrative Law, § 162, p. 965; 2 Am. Jur. 2d, Administrative Law, § 277 et seq., p. 107; 2 Am. Jur. 2d, Administrative Law, § 588, p. 418. In deciding issues involving parties, as in the case of establishing spacing units or making compulsory pooling orders, it acts in an adjudicatory manner and due process requires notice to the interested parties and an opportunity to be heard. Watkins v. Dodson, 159 Neb. 745, 68 N. W. 2d 508. The interpretation of administrative regulations is a function of the courts. 2 Am. Jur. 2d, Administrative Law, § 656, p. 517.

The next question to be answered is does the commission, where no spacing unit has previously been established, have authority under section 57-909, R. R. S. 1943, to enter a pooling order which is effective retroactively to a date prior to the filing of the application? The statutes themselves grant no such power. The commission is a creature of statute and its power and authority is limited by the statutory provisions creating it. Continental Oil Co. v. Oil Conservation Comm., 70 N. M. 310, 373 P. 2d 809; Carter Oil Co. v. State, *supra;* Railroad Commission of Texas v. Rowan Oil Co., 152 Tex. 439, 259 S. W. 2d 173; Union Pacific R. Co. v. Oil & Gas Conservation Comm., 131 Colo. 528, 284 P. 2d 242.

In determining the question we must take cognizance of the vested rights of the owners in the production from the Emery No. 2 well. "Under the law of capture, an owner of land acquires title to oil or gas which he produces from wells on his land although part of the oil or gas may have migrated from adjoining wells. He may thus appropriate the oil and gas that have flowed from adjacent lands without the consent of the owner of those lands and without incurring liability to him

for drainage." Baumgartner v. Gulf Oil Corp., 184 Neb. 384, 168 N. W. 2d 510. In Wood Oil Co. v. Corporation Comm., 205 Okla. 537, 239 P. 2d 1023, the Supreme Court of Oklahoma held, under a statute similar to ours, that the right of an owner to drill wells and take from pools below the oil and gas that he may be able to reduce to possession, including that which may migrate from the land of others, is subject to the reasonable exercise of the power of the state to prevent waste and secure equitable apportionment of landowners of the migratory oil and gas underlying the land. It further held that the lessee had title absolute to the oil produced by it prior to the pooling. This is consistent with the prior pronouncement of this court in Baumgartner v. Gulf Oil Corp., *supra.*

The question here involved was before the Supreme Court of Oklahoma in Wood Oil Co. v. Corporation Comm., *supra.* The court there held that the commission had no authority to enter a pooling order effective prior to the establishment of the spacing unit. There is some confusion in the language of the opinion because the court seems to refer to establishment of the spacing unit and entry of the pooling order interchangeably. Statutes which authorize compulsory pooling of interests in a spacing unit are not self-executing. A person seeking to avail himself of the benefits must apply to the appropriate board or commission. Gruger v. Phillips Petroleum Co., 192 Okla. 259, 135 P. 2d 485. Appellants in this case took no steps to avail themselves of the compulsory pooling provision for almost 2 years.

A reading of our statutes leads me to believe that the date of application or motion for the establishment of the spacing unit is the time beyond which the pooling may not be retroactive. No doubt the commission can on proper application and notice establish spacing units and pooling in the same proceeding. This leads to a consideration of the order of the commission in this case. It does not specifically purport to create a

spacing unit consisting of Government Lot 3. This, however, is the obvious intent of the order and any technical deficiencies in the journalization thereof could be corrected on the remand of this case. Since there was no lawfully established spacing unit prior to January 16, 1967, the commission erred in making its pooling order retroactive to October 15, 1964.

The judgment of the trial court in this case does not give specific reasons for its decision. Accordingly I would examine the evidence in support of the application to determine its sufficiency. I have carefully reviewed the expert testimony presented to the trial court in support of the appellants' claim that the oil underlying their portion of Government Lot 3 was draining to and being produced by the Emery No. 2 well. This testimony was not contradicted. It clearly supports the conclusion that sands underlying the appellants' tract were productive of oil. Apparently substantially the same evidence was introduced before the commission except for a change in the calculated percentages estimated to be underlying the two tracts. The commission allocated production based upon the relative percentage of recoverable oil originally in place under each tract. The evidence shows that the Emery No. 2 well is located high on the structure, and that the water drive is from the south and west pushing the oil onto and across the appellants' tract and then onto that of the appellees to be produced from the well. Under these circumstances we could not say as a matter of law that an allocation of the production of the well based upon the relative percentages of the recoverable oil originally in place underlying each of the tracts is erroneous.

I would remand the cause to the district court with directions to remand to the commission. The commission should determine the just and equitable share of the owners in the production of the White Feather Petroleum Company, Inc., Emery No. 2 well from and after

January 16, 1967, and the just and equitable charges to Sun Oil Company for drilling, completion, operation, storage, supervision, transportation, and other costs. I now take note of a problem which would arise on the remand to the commission. Section 57-909(2), R. R. S. 1943, provides that the order for reimbursement to the drilling working interest owner by the nondrilling working interest owner for costs shall be "out of, and only out of, production." The statute refers to "reasonable actual cost" but seems to contemplate only the situation where the spacing unit is established and the pooling order entered before the well is drilled. Where, as here, there is compulsory pooling with reference to an existing producing well, the matter is more complex. It would seem clear enough that Sun Oil Company should not be charged with a share of production costs attributable to the period in which it does not share in the production. As to drilling and completion costs, the problem would arise in connection with the valuation of the well investment. How should such costs be determined? Section 975, 5 Summers Oil and Gas (Perm. Ed.), p. 126, treats of this question and without citation of authority makes suggestions as to how the well investment should be valued. Since the question is not now before the court, I would not undertake to lay down a rule, but would call attention to the fact that the statute does not completely cover the matter. The commission, of course, could if necessary receive additional evidence necessary to make the above determination.

One other matter should be noted. The same parties were before this court in Sun Oil Co. v. Emery, 183 Neb. 793, 164 N. W. 2d 644. There this court determined that Farmers acquired fee title to its strip of land by its deed as against the contention that it held only an easement. As shown by the transcript here the district court, following that decision of this court, quieted the title of Farmers and its then lessee. The application to the Oil and Gas Conservation Commission involved here

was apparently filed prior to the commencement of the action involved in Sun Oil Co. v. Emery, *supra*. In their answer in the district court the appellees denied appellants' title. Appellants complain that the order of the district court in this case which contained a general finding for the appellees is contrary to the decision in the quiet title action previously mentioned because of the general finding in favor of the appellees. The appellees in their brief concede the ownership of Farmers and Sun in the minerals underlying the 4.19-acre tract. If the decree in the instant case is in conflict with the quiet title judgment it appears simply to have been an oversight in the journalization of the judgment. This matter could be corrected and clarified by the district court on the remand.

SMITH and McCOWN, JJ., join in this dissent.