Callie COWLING, Marie Grubbs, Marguerite Wilson, Robert Baird, Ed Baird, Jr., and The Adra Baird Estate, through its Co–Executors, Ed Baird, Jr., and Robert Baird, Plaintiffs and Appellees,

v.

The BOARD OF OIL, GAS AND MINING, DEPARTMENT OF NATURAL RESOURCES FOR the STATE OF UTAH, and Celsius Energy Company, a Nevada corporation, Defendants and Appellants.

No. 860518.

Supreme Court of Utah.

Dec. 31, 1991.

Rehearing Denied March 31, 1992.

Donald S. Coleman, Mark C. Moench, and David L. Wilkinson, Salt Lake City, for Bd. of Oil, Gas & Min.

Phillip Lear, Alan Sullivan, and Ruland J. Gill, Salt Lake City, for Celsius Energy.

Rosemary Beless, Albert J. Colton, and Anthony L. Rampton, Salt Lake City, for Robert and Ed Baird, Marguerite Wilson, Callie Cowling, and Estate of Adra Baird.

STEWART, Justice:

Celsius Energy Company is a working interest owner and the operator of the Ucolo No. 2 well, which was drilled on property leased from Adra Baird and, after her death, from her heirs. Adra Baird executed three leases conveying the mineral interests in her 110.14 acres to Celsius.[1] The Baird property is located in the north half of section 10 in a township of San Juan

---

1. An entity named KOGO also owns part of the working interest and operating rights.

County, Utah. Celsius completed the well in the Desert Creek zone on April 19, 1983, but the well was not connected to a production pipeline until November 1983. Also on April 19, 1983, Celsius executed a voluntary declaration of pooling pursuant to the three Baird leases covering the 110.14-acre Baird tract. The leases entitled the Bairds to a ⅙ royalty.

Celsius paid 100 percent of landowner's royalties from the time of first production until the entry of the Board's pooling order to Adra Baird and, after her death, to her heirs (plaintiffs in the court below and hereinafter collectively referred to as "the Bairds"). Celsius also had an oil and gas lease covering a federally owned tract which constituted the remainder of the north half of section 10 and adjoined the Baird tracts. Since Ucolo No. 2 was the discovery well of the pool it drained, there was no spacing order in effect when the well was completed. In 1983, Celsius petitioned the Board of Oil, Gas and Mining ("the Board") for a spacing order. Celsius preliminarily indicated that the area drained by Ucolo No. 2 might include part of the federal tract, in addition to the Baird tracts. However, since Celsius had not acquired sufficient data to show the actual area drained, the initial proceeding for a spacing order was dismissed.

In early January 1985, Celsius again applied to the Board for a single-well spacing and drilling unit order for the gas pool drained by Ucolo No. 2. After the Board held evidentiary hearings, the parties agreed to the size and configuration of the pool. On March 28, 1985, the Board issued findings of fact, conclusions of law, and a spacing and pooling order based on the evidence adduced and the parties' stipulation.

The Board found that Ucolo No. 2 drained a 300.14-acre area, of which the Baird heirs owned 110.14 acres and the Bureau of Land Management (the "BLM") owned 190 acres. On June 24, 1985, pursuant to a stipulation by the Bairds, Celsius, and the BLM, the Board modified its prior findings and order, finding that the area drained by the well was 200.14 acres,

110.14 acres of which were owned by the Bairds and 90 acres by the BLM. That order required a pooling of the Bairds' and the BLM's interests in the 200.14-acre drilling unit. Over the dissent of two Board members, the Board made the pooling order retroactive to the first day of the first month of production, April 1, 1983. The Board also found that Celsius had paid the Bairds $230,000 in royalties from the time of first production to the date of the Board's pooling order and ruled that the BLM was entitled to a share of those royalties based on the BLM's percentage of land in the drilling unit drained by Ucolo No. 2.

The Bairds appealed the Board's ruling that the pooling order should be retroactive to the date of first production to the district court. They argued that the Board's order deprived them of a vested right to all the royalties from Ucolo No. 2 from first production until entry of the spacing and pooling order. The district court ruled that the Board erred in making the pooling order retroactive and that the pooling order should have been made effective as of the time the spacing order was entered. The district court reasoned that the BLM could have protected its interest in the gas drained from its acreage in the north half of section 10 in one of two ways. First, the BLM might have petitioned the Board for an exception to Board Rule C-3(b), a statewide well location rule, and drilled its own well. Second, the BLM could have petitioned for a spacing and a pooling order at an earlier time than Celsius did.

Celsius and the Board appealed from the district court order to this Court. The BLM has not joined in the appeal. Celsius argues three interrelated points in support of its position that the pooling order should be retroactive to the date of first production. First, Celsius argues that this case is governed by *Bennion v. Utah State Bd. of Oil, Gas & Mining*, 675 P.2d 1135 (Utah 1983), which held that the Board did not err in making a pooling order retroactive to the date of first production to protect an adjoining landowner's correlative rights. Second, Celsius argues that because the statewide well location rule, Rule C-3(b), prohibited the BLM, as an adjoining land-

owner, from drilling a well on its own tract in section 10, the pooling order had to be retroactive to the date of first production to protect the BLM's correlative rights. That rule, Celsius argues, in effect nullified the right of the BLM to protect the BLM's rights under the law of capture by prohibiting it from drilling on its own land. Third, Celsius relies on the authority of *Farmer's Irrigation District v. Schumacher*, 187 Neb. 825, 194 N.W.2d 788 (1972), for the proposition that the pooling order must be retroactive in order to protect the correlative rights of the United States.

The Bairds' position is that correlative rights in oil and gas are dependent on the provisions of the Utah Oil and Gas Conservation Act and are defined by spacing orders. Specifically, the Bairds assert that until the Board enters a spacing order, the correlative rights of adjoining interest owners are neither defined nor definable with any particularity. Since the spacing and pooling orders in this case were entered at the same time, the pooling order could not be retroactive to first production because the BLM had no specifically defined correlative right prior to entry of the spacing order. The Bairds argue that *Bennion* is distinguishable because first production in that case occurred *after* entry of the spacing order. Therefore, the pooling order in *Bennion* was properly retroactive to the date of first production. They also assert that the statewide well location rule does not wholly displace the law of capture, but rather, that their interest in all the landowner's royalties was protected up to the time of first production by the law of capture.

## I. STANDARD OF REVIEW

■ We turn first to the standard of review to be applied to the decision of a lower court reviewing an order of an administrative agency. When a lower court reviews an order of an administrative agency and we exercise appellate review of the lower court's judgment, we act as if we were reviewing the administrative agency decision directly. *Bennion v. Utah State Bd. of Oil, Gas & Mining Co.*, 675 P.2d 1135, 1139 (Utah 1983). We do not defer, or accord a presumption of correctness, to the lower court's decision, since that court's review of the administrative record is no more advantaged than ours.

The Board and Celsius argue that this Court should defer to the Board's ruling on the ground that the issue before the Board was a mixed question of fact and law. Specifically, they assert that the issue is whether it was "just and reasonable" within the meaning of Utah Code Ann. § 40–6–6(5) for the Board to make the pooling order retroactive to first production to protect the BLM's correlative rights. They also assert that the Board acted reasonably and within its discretion and that this Court must therefore defer to the Board's ruling. The Bairds, on the other hand, contend that the central issue is when did the BLM's correlative rights come into existence under the provisions of the Utah Oil and Gas Conservation Act. That issue, the Bairds argue, is an issue of law.

In 1985, after *Bennion* was decided, the Legislature amended the Oil and Gas Conservation Act. Utah Code Ann. § 40–6–12(1) (Supp.1985) established the scope of judicial review of Board orders.[2] That section provides in part:

> An appeal from a rule or order of the board, except appeals from orders issued under Section 40–6–9, shall be a trial on the record and not be considered a trial de novo. The Court shall set aside the board action if it is found to be:
>
> (a) Unreasonable, unjust, arbitrary, capricious, or an abuse of discretion;

---

**2.** The Legislature has since adopted the Utah Administrative Procedures Act (UAPA), Utah Code Ann. §§ 63–46b–1 to –22 (1989 & Supp. 1991), which establishes uniform standards for judicial review of administrative agency actions. Section 63–46b–22(2) of the Act states that all agency adjudicative proceedings commenced "on or before December 31, 1987" are governed by "[s]tatutes and rules governing agency action, agency review, and judicial review ... in effect on December 31, 1987...." Because the action in this case was commenced before December 31, 1987, the provisions of the Oil and Gas Conservation Act control. Nevertheless, the outcome would be the same under UAPA.

(b) Contrary to constitutional right, power, privilege, or immunity;

(c) In excess of statutory jurisdiction, authority, or limitations;

(d) Not in compliance with procedure required by law;

(e) Based upon a clearly erroneous interpretation or application of the law; or

(f) As to an adjudicative proceeding, unsupported by substantial evidence on the record.

Both the Bairds and Celsius argue, somewhat off-handedly, that their conflicting claims to the pre-pooling order royalties are based on a constitutional right to a vested property interest. The Bairds assert that their property right arises under the law of capture, while Celsius contends that the BLM's right is based on the law of correlative rights. These positions invoke subparagraph (b) of § 40–6–12(1), which would require the application of correction-of-error standard.

The parties' positions, however, are really rooted in issues of statutory construction. The issue of where the law of capture ends and the law of correlative rights begins, at least with respect to compulsory pooling orders, is a question of state statutory law, not constitutional law. We do not, therefore, decide this issue under subparagraph (b), but rather under subparagraph (c). The issues that arise under that provision are issues of law, and we therefore accord no deference to the Board's resolution.

Although we recognize that in *Bennion* we deferred to the Board's ruling holding a pooling order retroactive to the time of first production, first production in that case occurred after the entry of a spacing order. For reasons that appear below, that fact is critical and, in essence, changes the nature of the issue before the Court.

## II. CORRELATIVE RIGHTS

■ The law of capture applies in all jurisdictions until modified by state law. 1 Williams & Meyers, *Oil and Gas Law* § 204.4 (1986). Under the common law of capture, a landowner could drill for oil or gas on its land wherever and with as many wells as the landowner thought appropriate. If oil or gas were found, the landowner would not be liable to adjacent landowners whose lands were also drained, even if the producing well were drilled next to the adjoining landowner's boundary. Moreover, the producing landowner would be entitled to produce as much oil or gas as possible, even though the ultimate recovery of oil or gas from the reservoir was diminished. Thus, under the law of capture, a landowner incurred no liability for causing oil or gas to migrate across property boundaries and was not required to compensate adjoining landowners for draining oil and gas from their lands. *Thompson v. Consolidated Gas Utilities Corp.*, 300 U.S. 55, 68, 57 S.Ct. 364, 370, 81 L.Ed. 510 (1937); *Champlin Refining Co. v. Corporation Comm'n*, 286 U.S. 210, 233, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932); *Brown v. Spilman*, 155 U.S. 665, 669–70, 15 S.Ct. 245, 246–47, 39 L.Ed. 304 (1895); 1 William & Meyers, *Oil and Gas Law* § 204.4, at 55–57 (1986).

We described the consequences of the law of capture on early drilling and production practices in *Bennion v. Utah State Bd. of Oil, Gas & Mining*, 675 P.2d, 1135, 1137 (Utah 1983):

This rule of law produced results that were unfair to many landowners and development practices that were uneconomical or wasteful for all. Thus, it encouraged the drilling of more wells than necessary to drain a field, and it permitted techniques and rates of production that augmented the profits of the property owner whose land was producing, but wasted the resources of the field as a whole. Allen, "An Argument for Enforced Unit Development of Oil and Gas Reservoirs in Utah," 7 *Utah L.Rev.* 197 (1960). Legislative remedies were required.

In 1955, the Legislature enacted the Utah Oil and Gas Conservation Act. That Act modified the law of capture and established the Utah Board of Oil, Gas and Mining to regulate the development and production of oil and gas in the state for the

purpose of preventing waste and protecting correlative rights. The Act was amended and superseded by the Utah Oil and Gas Conservation Act of 1983. *See Utah's Oil & Gas Conservation Act of 1983*, 5 J. Energy L. & Pol'y 49 (1984). The 1983 Act was intended to promote the following purposes, among others: the development of oil and gas in a manner that would (1) prevent waste; (2) provide for the development and operation of oil and gas properties so as to maximize ultimate recovery; and (3) protect the "correlative rights of all owners." Utah Code Ann. § 40–6–1 (Supp. 1983). These objectives are significantly interrelated.

■ To achieve these ends, the Act authorizes the Board to limit a landowner's right to drill as many wells and in whatever locations on its land as the landowner chooses. Although the Act modifies the law of capture, it does not wholly displace that law, contrary to the position of the Board and Celsius. *See generally Magnolia Petroleum Co. v. Blankenship*, 85 F.2d 553, 555 (5th Cir.1936); *Desormeaux v. Inexco Oil Co.*, 298 So.2d 897 (La.Ct.App.); *writ refused*, 302 So.2d 37 (1974). In essence, the Act establishes a regulatory scheme that protects correlative rights, while also continuing the law of capture to a limited extent. *See generally Carter Oil Co. v. State*, 205 Okl. 541, 240 P.2d 787, 790 (1951).

The Legislature initially defined correlative rights as "the owners' or producers' just and equitable share in a pool." Utah Code Ann. § 40–6–4(j) (Supp.1955). In the 1983 Act, however, the Legislature amended that definition to mean the "opportunity of each owner in a pool to produce his just and equitable share of the oil and gas in a pool without waste." Utah Code Ann. § 40–6–2(2) (1988). By defining correlative rights to be a "just and equitable share" in a pool, the statute makes individual correlative rights dependent upon the overriding objective of obtaining the greatest production possible from the pool, and not from any particular well or property. The definition of correlative rights does not, therefore, give a mineral interest owner an abso-

lute right to all the oil or gas under one's land. Moreover, the term "without waste" is crucial because it imposes a duty upon the Board to ensure maximum recovery of the resource. *See generally Ohmart v. Dennis*, 188 Neb. 260, 196 N.W.2d 181 (1972).

■ In essence, a landowner's correlative right is a unique property right. Before a spacing order is entered, a correlative right is a right to an undifferentiated and unquantifiable interest in an oil or gas pool beneath one's land. The right initially is nothing more than an "opportunity" to produce a "just and equitable share" of oil and gas "without waste."

The mechanism for defining correlative rights in a pool of oil or gas is a spacing order, which establishes field-wide drilling units. Section 40–6–6(1) authorizes the Board to establish drilling units covering "any pool" of oil or gas. The order establishing the drilling units must "cover all lands ... underlaid by the pool." § 40–6–6(3). All drilling units "shall be of uniform size and shape for the entire pool unless the board finds that it must make an exception due to geologic or geographic or other factors." *Id.* The order must specify "the acreage to be embraced within each drilling unit ... but the unit shall not be smaller than the maximum area that can be efficiently and economically drained by one well." § 40–6–6(1)(a). Only one well may be drilled "from the common source of supply on any drilling unit." § 40–6–6(1)(b). The Board may modify its original order on the basis of additional evidence "to include additional areas determined to be underlaid by the pool." § 40–6–6(3). Once the Board fixes the size of the drilling units in a field, "the drilling of any well into the pool at a location other than authorized by the order is prohibited." § 40–6–6(4).

The Board's determination of the size of the drilling units in a field is necessarily a discretionary determination based on the acreage that wells in the field can efficiently drain so as to maximize production from the pool as a whole and minimize the waste of oil and gas. *See* § 40–6–6(1). The de-

termination must, however, be based on geologic and reservoir engineering evidence pertaining to a number of factors, including; the reservoir's physical characteristics, such as the strength and nature of the pressures within the reservoir and the size and type of the producing formation; the porosity and permeability of the sands in which the hydrocarbons are trapped and through which they must move; available technology, including methods and resources for secondary and tertiary recovery; and, far from least, economic considerations such as the market price of oil and gas and extraction costs. It is, however, impossible to extract all the oil and gas from a pool, even with secondary and tertiary enhanced recovery techniques.

When a successful exploratory well is initially drilled, it is ordinarily impossible to determine with any degree of precision what area the well drains or the characteristics and extent of the pool. After the initial discovery is made, however, geologic and reservoir engineering data can be developed which enable the Board to fix the size of the drilling units needed to drain the reservoir efficiently. Landowners' correlative rights are then definable based on each landowner's fractional share of the total surface ownership within a particular drilling unit. *See* § 40–6–6(6). Of course, not all the wells will produce equal volumes of oil or gas. Thus, the actual value of an interest owner's interest in a particular drilling unit will vary depending on the productivity of the well. Accordingly, a fractional interest in one drilling unit may have greater value than the same fractional interest in another drilling unit in the same field.

 In short, under the Act, it is not possible to ascertain a landowners' correlative rights until the Board acquires the necessary data in a formal hearing, makes findings of fact, and enters a spacing and drilling unit order.

The following example illustrates the relative nature of landowners' correlative rights on the Board's judgment in determining the size of drilling units in a field. If the Board fixes 160 acres as the size of a drilling unit, the correlative rights of adjoining landowners in such a unit will be different than if the unit is fixed at 80 acres. A reduction of a drilling unit from 160 acres to 80 acres could increase or decrease a landowner's share in the unit. Indeed, the Board in this case modified the size of the drilling unit after additional evidence was adduced, from 300.14 acres to 200.14 acres, thereby decreasing the BLM's correlative rights.

 Voluntary pooling agreements and forced pooling orders are the mechanisms used to enforce correlative rights.[3] Pooling orders are based on each landowner's fractional share of surface ownership in a drilling unit. *See* § 40–6–6(5), (6). A pooling order must, therefore, be based on the existence of a drilling unit.[4] *See*

---

**3.** Utah Code Ann. § 40–6–6(5) provides:

> Two or more owners within a drilling unit may pool their interests for the development and operation of the unit. In the absence of voluntary pooling, the board may enter an order pooling all interests in the drilling unit for the development and operation. The order shall be made upon terms and conditions that are just and reasonable. Operations incident to the drilling of a well upon any portion of a unit covered by a pooling order shall be deemed for all purposes to be the conduct of the operations upon each separately owned tract in the unit by the several owners. That portion of the production allocated or applicable to each tract included in a unit covered by a pooling order shall, when produced, be deemed for all purposes to have been produced from each tract by a well drilled thereon.

**4.** A working interest owner who does not enter into a voluntary pooling order with an operator incurs no out-of-pocket costs of drilling, no risk of a dry hole, and even if there is some production, no risk that the cost of drilling will exceed production proceeds. Therefore, under a forced pooling order, a nonconsenting working interest owner's share of drilling costs is deducted from that owner's share of production. Payout must be achieved before the owner is entitled to share in the production. *Bennion v. Utah State Bd. of Oil, Gas & Mining*, 675 P.2d 1135 (Utah 1983); Utah Code Ann. § 40–6–6(6), (7). Nonconsenting owners are also subject to penalties ranging from 150% to 200% of the cost of drilling a well in the unit in order to compensate the working interest owners for assuming the risks of not recovering their investment and for their up-front payment of the drilling costs. *Cf. In re SAM Oil*, 817 P.2d 299 (Utah 1991).

*generally,* 6 Williams & Meyers, *Oil and Gas Law* § 905.2 (1986). Indeed, § 40–6–6(6) of the Act contemplates that a pooling order shall be made with respect to a particular drilling unit. That section states in part:

Each pooling order shall permit the drilling and operation of a well on the drilling unit by any owner within the drilling unit, and shall provide for the payment of the costs, including a reasonable charge for supervision and storage facilities, as provided in this subsection.

Because § 40–6–6(5) authorizes pooling orders to be entered only with respect to established drilling units and because a pooling order that pools working interests must take into account the costs of drilling, by implication the statutory scheme contemplates that pooling orders shall be retroactive to the date of first production, *see Bennion,* 675 P.2d at 1142, but only if a spacing order was then in effect.

Although a pooling order theoretically could be made retroactive to the date of first production from an exploratory or wildcat well, even though that date is prior to the entry of a spacing order, the Act does not contemplate that result. Retroactivity of a pooling order under those circumstances would give adjoining interest owners correlative rights before those rights are definable. This view is supported by cases from other jurisdictions. For example, Oklahoma courts have held that a pooling order may not be retroactive to a date prior to a spacing order, because it is a spacing order that establishes and defines correlative rights and abrogates the law of capture. *Ward v. Corporation Comm'n,* 501 P.2d 503 (Okla.1972); *Wood Oil Co. v. Corporation Comm'n,* 205 Okl. 537, 239 P.2d 1023 (1950); *Barton v. Cleary Petroleum Corp.,* 566 P.2d 462 (Okla.Ct.App.1977). Significantly, Oklahoma, like Utah, places great importance on the protection of correlative rights. *See Kingwood Oil Co. v. Corporation Comm'n,* 396 P.2d 1008 (Okla.1964).

The law in other jurisdictions also holds that pooling orders may not be retroactive to a time prior to the entry of a spacing order, in some cases on constitutional grounds because it would impair rights that vested under the law of capture. *See, e.g., Pierce v. Goldking Properties, Inc.,* 396 So.2d 528 (La.Ct.App.1981); *Desormeaux v. Inexco Oil Co.,* 298 So.2d 897 (La.Ct.App.1974); *Buttes Resources Co. v. Railroad Comm'n,* 732 S.W.2d 675 (Tex. Ct.App.1987); *Ward v. Corporation Comm'n,* 501 P.2d 503 (Okla.1972). *See also Mitchell v. Simpson,* 493 P.2d 399 (Wyo.1972); 5 Eugene Kuntz, *Oil and Gas* § 77.3, at 398–99 (1978).

Although courts in North Dakota and Nebraska have sustained pooling orders that were retroactive to a date prior to the entry of a spacing order, those cases are distinguishable. In *Texaco Inc. v. Industrial Comm'n,* 448 N.W.2d 621 (N.D.1989), the court held that a pooling order should be retroactive to first production from a wildcat well because of a statute unlike Utah's that established a procedure for and required the entry of a temporary spacing order within thirty days of completion of such a well. The court stated that if a wildcat well "is drilled on land not covered by a spacing order, the Commission must docket a spacing hearing within thirty days and thereafter issue a temporary spacing order." *Id.* at 623.

Nebraska also allows a pooling order to be retroactive to a date prior to the entry of a spacing order, but only to remedy inequitable conduct by the operator of a well. In *In Re Farmers Irrigation Dist.,* 187 Neb. 825, 194 N.W.2d 788 (1972), a case Celsius relies on, the court recognized the inequity that can be caused by a retroactive pooling order because such an order would permit an "adjoining owner to sit back and await the successful outcome of drilling operations without asking for a pooling agreement...." *Id.* 194 N.W.2d at 792. Nevertheless, the court sustained a pooling order that was retroactive to first production, because of the well operator's "obvious delaying tactics." *Id.* at 792. We do not disagree in principle with that result, but as stated below, there were no obvious delaying tactics in this case.

Contrary to appellants' contention, *Bennion v. Utah State Bd. of Oil, Gas & Mining*, 675 P.2d 1135 (Utah 1983), does not require the pooling order in this case to be retroactive to first production. In *Bennion*, the Board had issued field-wide spacing orders for the Bluebell, Altamont, and Cedar Rim–Sink Draw Fields in 1971 and 1972. A producing well was completed July 7, 1974, in an area covered by a spacing order. Although *Bennion* sustained an adjoining working interest owner's rights in first production, the entry of the spacing order preceded the date of first production. *Bennion* simply did not address the precise question whether a pooling order could be retroactive to first production when made prior to the entry of a spacing order.

Celsius argues that the rationale in *Bennion* controls. The *Bennion* Court justified the retroactivity of the pooling order on the ground that the spacing order prohibited an adjoining interest owner within the drilling unit from drilling on his or her own land. Celsius asserts that here, the statewide well-location rule, Rule C–3(b), prevented the BLM from drilling on that part of its tract located in section 10 and that therefore the BLM was entitled to a pooling order retroactive to the date of first production. There is, however, a significant difference between a spacing order and Rule C–3(b).

Rule C–3(b) prohibits the location of wells within certain distances of boundary lines and other wells. Its purposes include the prevention of waste by avoiding unnecessary dissipation of reservoir pressures before a spacing order specifically tailored to a field can be entered. That purpose justifies a limitation on well locations before a spacing order is entered. The minor restriction of a landowner's right to drill under the law of capture does not mean, however, that the law of correlative rights attaches.

█ Thus, Rule C–3(b) does not wholly nullify the law of capture. As long as the narrow limitations of that rule are not violated, a well may be drilled anywhere. Even though the rule prohibits drilling at certain locations, it does not establish a basis for defining legal interests in a pool. In *Carter Oil Co. v. State*, 205 Okl. 541, 240 P.2d 787 (1951), the Oklahoma Supreme Court addressed the effect of a similar rule governing the general location of wells outside areas covered by field spacing orders. The Court stated: "We cannot subscribe to the contention presented that the effect of the Commission rule 202 establishes the acreage as a well-spacing and drilling unit. That rule simply establishes the location of a drilling site and no more." *Id.* 240 P.2d at 794.

█ Moreover, Rule C–3(e) expressly allows an adjoining interest owner to petition the Board for an exception location. An adjoining mineral estate owner who is prevented from drilling a well may also seek to enter into a voluntary pooling agreement to protect that interest. *See* Utah Code Ann. § 40–6–6(5). An owner's failure to take action to establish and protect his or her interest in production prior to the entry of a spacing order constitutes a waiver of that interest until a drilling unit is established. *See Ohio Oil Co. v. Indiana*, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729 (1900); *Exxon Corp. v. Thompson*, 564 So.2d 387 (La.Ct.App.1990).

█ We have held that the statutory prerequisite for a pooling order is the existence of a spacing order and that a spacing order defines the fractional interests in a drilling unit as of the date of the spacing order. If, however, an operator of a well engages in inequitable conduct by wrongfully delaying an application for a spacing order, thereby prejudicing another's correlative right, the Board may make appropriate adjustments as to the date the pooling order is effective. That is, a pooling order may be made effective prior to the entry of a spacing order to offset any inequitable delay by the operator in pursuing a petition for a spacing order. Section 40–6–6(5) specifically states that the Board may enter a pooling order "upon terms that are just and reasonable." Clearly, the statutory scheme contemplates prompt action in the prosecution of a petition for a spacing order.

■ The Board's critical conclusions of law in this case were as follows:

24. Section 40–6–6(5) requires that the Board pool upon terms that are just and reasonable. This would mean that each owner in the pool is entitled to share in the benefits of production in proportion to their ownership of the pool. In the ordinary cases, this is accomplished by allowing each owner in a spacing unit to participate in production from the well from first production. The Board has the power and authority to make pooling effective as of first production. However, there may be circumstances in which such application of this rule would not be just and reasonable; and in such cases the Board has the power and authority to make the pooling effective as of another date.

25. Upon completion of the UCOLO well No. 2 as a gas well, rule C–3–(b) of the Board's General Rules and Regulations which establishes statewide spacing in the absence of special field/pool spacing precludes the drilling for the production of an additional Desert Creek gas well in the N ½ of Section 10. Thus, the general rule which we stated which makes pooling effective as of first production should apply in the absence of special circumstances which would make pooling as of such date not just and reasonable. We find no such circumstances in this case.

■ The Board, in applying the rule formulated in *Bennion v. Bd. of Oil, Gas & Mining*, erred as a matter of law. *Bennion* dealt with a spacing order that was entered before the well was completed. The pooling order was properly made retroactive to first production because that was after entry of the spacing order. With respect to wildcat or exploratory wells, however, where no preexisting field-wide spacing order has been entered, the rule is that a pooling order should be effective no earlier than the date of a spacing order, unless there are special circumstances which would make it just and equitable for an order to be retroactive to protect correlative rights established by the Act from inequitable or overreaching conduct. Thus,

if the operator of a successful wildcat well wrongfully delays petitioning for a spacing order or wrongfully prolongs the hearing process, the Board may make a pooling order retroactive to the date of the application for a spacing order, or possibly to a prior time.

Here, the Bairds cannot be charged with any kind of wrongful delay. Celsius was the appropriate party for filing a petition for a pooling order. The record indicates that Celsius was not dilatory; indeed, it appeared anxious for an early pooling order because it wanted to avoid the effects of a federal compensatory royalty. In fact, Celsius petitioned for a pooling order before it had developed sufficient evidence to sustain the order, causing it to subsequently withdraw its petition. Furthermore, the BLM was aware that Ucolo No. 2 had been completed in a known geologic formation, providing it with some basis for surmising that Ucolo No. 2 might drain gas from under the BLM tract. Under those circumstances, the BLM might have taken some action, but it did not. In all events, the Bairds did not engage in any inequitable conduct or do anything to delay entry of the spacing order.

In sum, the Board erred as a matter of law in ruling that the general rule in these circumstances is that a pooling order should be retroactive to the date of first production. Furthermore, there is no basis in this case for concluding that it would have been appropriate to invoke the "just and equitable" exception to the general rule and to hold that the pooling order, on the particular facts of this case, should have been made effective prior to the entry of the spacing order.

We affirm the district court order.

HALL, C.J., HOWE, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.