Sam H. BENNION, Petitioner,

v.

GRAHAM RESOURCES, INC., and the
Utah Board of Oil, Gas and
Mining, Respondents.

No. 910089.

Supreme Court of Utah.

March 4, 1993.

R. Paul Van Dam, Atty. Gen., Thomas A. Mitchell, Asst. Atty. Gen., Salt Lake City, for Board of Oil, Gas and Mining.

Phillip W. Lear, Matthew F. McNulty, Salt Lake City, for Graham Resources.

Peter Stirba, Salt Lake City, for Sam H. Bennion.

ZIMMERMAN, Justice:

Sam H. Bennion petitions for a writ of review from an order of the Utah Board of Oil, Gas and Mining granting summary judgment for Graham Resources, Inc. The Board ruled that section 40–6–9 of the Code, Utah Code Ann. § 40–6–9 (Supp. 1990) (amended 1992), did not entitle Bennion to an order requiring Graham Resources to account for and pay Bennion's share of the proceeds of oil and gas production because a pooling arrangement was not in place. We affirm.

The relevant facts are not in dispute. Bennion owns an undivided mineral interest in certain lands within a drilling unit in Duchesne County. He is a nonconsenting interest owner, i.e., an owner within the drilling unit "who refuses to agree to bear his proportionate share of the costs of the drilling and operation of the well." Utah Code Ann. § 40–6–6(6) (1988) (current version at *id.* § 40–6–2(11) (Supp.1992)). Graham Resources operates two oil and gas wells within the same drilling unit. However, there is no pooling arrangement, voluntary or involuntary, between Bennion and Graham Resources.[1] *See id.* § 40–6–6(5)–(8) (1988) (current version at *id.* § 40–6–6.5 (Supp.1992)). The record suggests that there are no other interest owners in the drilling unit.

---

1. Graham Resources claims that the two wells are not located on lands owned by Bennion or in which he owns an interest. Bennion does not controvert this assertion.

On July 17, 1990, Bennion filed with the Board a request for agency action under section 40–6–9, asking the Board to order Graham Resources to account for and to pay Bennion all proceeds due him from the two wells. The Board asked the parties to attempt to negotiate a resolution, but by August 31, 1990, they had failed to reach an agreement. The Board then scheduled a hearing for September 27, 1990. *See id.* § 40–6–9(5), (6) (Supp.1990 & Supp.1992).

On September 6th, Bennion filed a pre-hearing issue statement with the Board. On September 10th, Graham Resources moved for dismissal or, in the alternative, for summary judgment. On September 17th, Graham Resources filed its prehearing issue statement. Bennion did not file a response to Graham Resources' motion, but sent a letter to the Board objecting to any consideration of the motion as being contrary to statutory procedure. Bennion also asked the Board to clarify the issues that would be addressed at the September 27th hearing. The Board did not respond to Bennion's letter. Two days before the hearing, Bennion moved for a continuance, claiming that he had a scheduling conflict and that he was unclear as to what issues would be addressed at the hearing.

At the September 27th hearing, the Board denied Bennion's motion for a continuance and granted Graham Resources' motion for summary judgment. The Board determined that Bennion's motion for a continuance was unwarranted because he had ample knowledge of the issues before the Board and of the date of the hearing. In granting summary judgment, the Board reasoned that Bennion was not entitled to proceeds from the wells under section 40–6–9 until a voluntary pooling agreement or involuntary pooling order was in effect concerning the wells. Bennion now seeks review of the Board's order.

■ We first state the standard of review. Because this dispute turns on statutory interpretation, we review the Board's interpretation of the applicable statutes for correctness and give its view on the matter no particular deference. *Id.* § 63–46b–

16(4)(d); *see Cowling v. Board of Oil, Gas & Mining*, 830 P.2d 220, 223 & n. 2 (1991).

Before proceeding to the merits, we find it helpful to review briefly the development of Utah oil and gas law. Prior to 1955, Utah recognized the rule of capture. *Cowling*, 830 P.2d at 224. This doctrine allowed a landowner to drill for oil or gas wherever and with as many wells as the landowner thought appropriate. *Id.* Because oil and gas are found in subterranean pools, or reservoirs, these wells often drained oil and gas, not only from beneath the well owner's land, but from beneath adjacent lands as well. Under the rule of capture, however, the well owner was not required to compensate those adjacent landowners for the oil and gas removed from beneath their lands. *Id.* Those adjacent landowners therefore were forced to drill their own wells in an attempt to protect their share of the pool. Such practices were uneconomical and wasteful. *Id.*

In 1955, the Utah Legislature enacted the Utah Oil and Gas Conservation Act, which modified the law of capture and established the Board. *Id.* The purposes of the 1955 Act were to conserve oil and gas resources by reducing waste and maximizing efficient production and to protect landowners' "correlative rights," i.e., their just and equitable shares of the pool. *Id.* at 224–25. The 1955 Act was superseded by the Utah Oil and Gas Conservation Act of 1983, which was intended essentially to serve the same purposes as the prior Act, but placed more authority in the Board. *See* Denise A. Dragoo & Ruth Ann Storey, *Utah's Oil & Gas Conservation Act of 1983*, 5 J. Energy L. & Pol'y 49, 52–53 (1983). Because a correlative right is merely "a right to an undifferentiated and unquantifiable interest in an oil or gas pool beneath one's land," the 1983 Act created a mechanism to identify and define correlative rights in a particular oil or gas pool. *Cowling*, 830 P.2d at 225. That mechanism is a "well-spacing order" in which the Board establishes a "drilling unit" that is coextensive with the pool. *See id.* Once the Board has established a drilling unit, a landowner's correlative right can be determined based on his or her "fractional share

of the total surface ownership within a particular drilling unit." *Id.* at 226.

The spacing order further limits the number and location of wells that can be placed in the drilling unit. *See id.* at 225. No interest owner, including a nonconsenting owner, can drill his or her own well in the unit unless authorized by the spacing order. *Bennion v. Utah State Bd. of Oil, Gas & Mining,* 675 P.2d 1135, 1142 (Utah 1983). Therefore, this court has stated that "a vested right to some compensation is ... essential to prevent the regulatory legislation from unconstitutionally depriving" the adjacent owner of his or her property without compensation. *Id.*

In the instant case, Bennion argues that his "vested right" within the drilling unit entitles him to payments for his mineral interest and allows him to invoke Board authority under section 40–6–9. That statute provided, at the time, that "oil and gas proceeds derived from the sale of production from any well producing oil, gas, or related hydrocarbons in the state shall be paid to all persons *legally entitled* to these payments...." Utah Code Ann. § 40–6–9(1) (Supp.1990) (emphasis added) (current version at *id.* § 40–6–9(1)(a) (Supp.1992)). If a party is legally entitled to payments that have not been made, that party can petition the Board for a hearing on the matter. *Id.* § 40–6–9(4) (Supp.1990 & Supp.1992). If the Board finds that the failure to pay the proceeds was "without reasonable justification, it may order a complete accounting and require the proceeds and interest to be paid...." *Id.* § 40–6–9(7).[2]

▮ The version of section 40–6–9 at issue here does not define "legally entitled." However, the Board concluded that Bennion was not "legally entitled" to payments because no pooling arrangement was in effect. The Board reasoned that section 40–6–9 must be read in conjunction with section 40–6–6, which governs the establishment of drilling units and the rights of nonconsenting owners under pooling orders

within those units. Subpart (8) of section 40–6–6 provides in pertinent part:

> The operator of a well *under a pooling order* in which there are nonconsenting owners shall furnish the nonconsenting owners with monthly statements of all costs incurred, together with the quantity of oil or gas produced, and the amount of proceeds realized from the sale of this production during the preceding months. If and when the consenting owners recover from a nonconsenting owner's relinquished interest the amounts provided for in Subsection (6) of this section, the relinquished interest of the nonconsenting owner shall automatically revert to him [or her]; and the nonconsenting owner shall from that time own the same interest in the well and production from it, and be liable for the further costs as if he [or she] had participated in the initial drilling and operation. These costs are payable out of production unless otherwise agreed between the nonconsenting owner and the operator.

Utah Code Ann. § 40–6–6(8) (1988) (emphasis added) (repealed 1992) (current version at *id.* § 40–6–6.5(7)–(9) (Supp.1992)).

The plain language of subpart (8) indicates that a pooling order must be in place before an operator is required to make an accounting and payment to a nonconsenting mineral interest owner. In addition to the plain meaning of this provision, the mechanism for assigning costs described in the second sentence of subpart (8) depends on the existence of a pooling order. A nonconsenting owner "relinquishes" his or her interest to the extent that it is worth the value of the amounts he or she must pay the consenting owners under subpart (6) of section 40–6–6, and the relinquished interest "reverts" under subpart (8) when the nonconsenting owner makes the specified payment. The amounts set forth in subpart (6) include the nonconsenting owner's share of the cost of certain surface equipment used in connection with the well and other costs of operation, and a nonconsent penalty, to be determined by the

---

**2.** The 1992 amendment to section 40–6–9 did not substantively change the provisions discussed in the text. *See* Utah Code Ann. § 40–6–9 (Supp.1992).

Board, that is 150 percent to 200 percent of the costs incurred to drill and complete the well. *Id.* § 40–6–6(6) (1988) (amended 1992) (current version at *id.* § 40–6–6.5(4)(d)(i)(D) (Supp.1992)). Absent a voluntary agreement, these amounts can be established only through a pooling order. *See id.*

■ Bennion argues that the phrase "legally entitled" in section 40–6–9 does not require that a pooling arrangement be in place, but requires only that the person seeking relief have a vested property interest in the oil and gas at issue. He argues that because he has an undisputed, vested property interest in the oil and gas being produced from the wells operated by Graham Resources, he is "legally entitled" and therefore has a right to immediate payment. We agree with the Board, however, that under the facts of this case, section 40–6–6 sets forth the standards by which Bennion's legal entitlement under section 40–6–9 is to be determined. A nonconsenting mineral interest owner within a drilling unit may not rely upon the Utah Act to enforce his or her rights unless a pooling arrangement is in effect.[3]

From the comprehensive regulation of relative rights and responsibilities contained in section 40–6–6, as well as the specific reference to an antecedent pooling order, we think that the legislature intended that this section regulate the legal entitlement of a nonconsenting owner under section 40–6–9 and that a pooling order be in place before a nonconsenting owner can enforce his or her vested rights. Bennion's argument—that the "legally entitled" language in section 40–6–9 should be read as equivalent to "with a vested property interest"—is untenable. If we were to accept his argument, we would effectively strike the pooling language in section 40–6–6 and ignore that section's pervasive regulation of the relations between consenting and nonconsenting owners.[4]

■ We recognize that Bennion has vested, correlative rights by virtue of his undivided mineral interest in lands within the drilling unit established by the Board pursuant to section 40–6–6. However, as we said in *Cowling*, the appropriate mechanisms for the *enforcement* of these vested, correlative rights are "[v]oluntary pooling agreements and forced pooling orders," governed by section 40–6–6. *See Cowling*, 830 P.2d at 226. Without a voluntary pooling arrangement between the parties or a pooling order from the Board, Bennion has no statutory means of enforcing his correlative rights. Therefore, his attempt to invoke section 40–6–9 as a means of enforcement must fail.

As an alternative argument, Bennion contends that even if a pooling order is a prerequisite to relief under section 40–6–9, the Board had the statutory power, on its own motion, to force pool the unit or order the parties to agree to pooling, thus solving the problem of his lack of entitlement. He contends that he orally requested the Board to force pooling on its own motion at the hearing.

Bennion's argument is unpersuasive. He does not cite to anything in the Utah Oil and Gas Conservation Act or the Board's rules that could serve as a basis for requiring the Board to force pooling on its own motion. Without a request for agency ac-

---

**3.** We note that Bennion expressly disavows any reliance on common law principles in his challenge to the Board's order. *See generally Cowling*, 830 P.2d at 225 (noting that the common law rule of capture is abrogated only to the extent that it conflicts with the Utah Oil and Gas Act); *Bennion v. Utex Oil Co.*, 905 F.2d 324, 326 (10th Cir.1990) (noting that the rights of nonconsenting owners are largely controlled by statute, but statutes do not set forth all available remedies).

**4.** We acknowledge that before a well achieves paid-out status, section 40–6–6(7)(b) grants a nonconsenting owner of a tract in a drilling unit that is not subject to a lease or other contract for development of oil and gas the right to "receive as a royalty the average landowner's royalty attributable to each tract within the drilling unit." Utah Code Ann. § 40–6–6(7)(b) (1988) (amended 1992) (current version at *id.* § 40–6–6.5(6)(a) (Supp.1992)). The wells at issue in this case had achieved paid-out status, and Bennion does not claim any entitlement under the statutory royalty provision. Thus, we do not address whether a claimant to the statutory royalty may take advantage of section 40–6–9.

tion to force pooling, the decision is purely discretionary. This is clear from the language of section 40–6–6(5): "In the absence of voluntary pooling, the board *may* enter an order pooling all interests...." Utah Code Ann. § 40–6–6(5) (1988) (emphasis added) (amended 1992) (current version at *id.* § 40–6–6.5(2)(a) (Supp.1992)). Bennion did not include a request for forced pooling in his petition for agency action. He cannot now complain of the Board's failure to enter an order he did not seek.

Finally, Bennion claims that he was treated unfairly because the Board did not respond to his letter requesting a clarification of the issues. Although perhaps unwise, the Board's failure to respond to the letter did not violate any statute, rule, or principle of administrative law that has been brought to our attention. More importantly, both parties' prehearing issue statements and Graham Resources' motion for dismissal or summary judgment and supporting memorandum clearly indicate that Bennion knew what issues would be addressed at the September 27th hearing. Also, nothing in the record undermines the Board's conclusion that Bennion had ample time to address the issues raised at the hearing.

We have reviewed Bennion's other claims and find them to be without merit. The Board's order dismissing Bennion's petition is affirmed.

HALL, C.J., HOWE, Associate C.J., and DURHAM, J., concur.

STEWART, Justice, dissenting.

I disagree with the majority opinion to the extent that it sustains the Board of Oil, Gas and Mining in what I think is an overly technical application of statutory procedures. Bennion's petition for agency action under Utah Code Ann. § 40–6–9 asked the Board to order Graham Resources to account for and pay Bennion all proceeds due him from two wells. No one doubts that an accounting was appropriate. The only issue is whether Bennion should have formally sought a pooling order first. The Board could certainly have granted Bennion appropriate relief in an accounting pro-

ceeding and ascertained Bennion's share of the costs to be offset against what Graham owed Bennion.

It is clear that Graham Resources had all the information necessary for the Board to determine Bennion's "proportionate share of the cost of the drilling in the operation of the well" and could have entered a formal pooling order if that were necessary. *See* Utah Code Ann. § 40–6–6(6) (1988). Under the circumstances, an accounting was an appropriate procedural vehicle for determining what Graham owed Bennion. If the entry of a pooling order depended upon bringing other nonconsenting owners in the drilling unit before the Board, that could easily have been done.

The dispute in this case seems to have grown out of animosities between Bennion and Graham Resources, which may have provoked some degree of irritation on the part of the Board. If so, that is not a valid reason for refusing to grant the relief to which a petitioner is entitled. It seems to me that the Board's insistence upon such a highly technical procedural distinction serves no useful purpose and is capricious.