INB LAND & CATTLE, LLC, a Colorado
limited liability company, Plaintiff–
Appellant,

v.

KERR–McGEE ROCKY MOUNTAIN
CORPORATION, a Delaware cor-
poration, Defendant–Appellee.

No. 07CA0722.

Colorado Court of Appeals,
Div. III.

June 12, 2008.

Dufford, Waldeck, Milburn & Krohn,
L.L.P., Nathan A. Keever, William S. De-
Ford, Grand Junction, Colorado, for Plain-
tiff–Appellant.

Davis, Graham & Stubbs, LLP, Gale T.
Miller, Michael J. Gallagher, Erin McAlpin
Eiselein, Denver, Colorado, for Defendant–
Appellee.

Opinion by Judge CASEBOLT.

In this oil and gas case involving claims of
mineral trespass, conversion, and civil theft,
plaintiff, INB Land & Cattle LLC, appeals
the summary judgment in favor of defendant,
Kerr–McGee Rocky Mountain Corporation.
We affirm.

In 1970, the parties' predecessors in inter-
est entered into an oil and gas lease that
gave Kerr–McGee's predecessor the right to
develop and market all minerals underlying
INB's land (working or operating interest),
in exchange for a one-eighth royalty from the
minerals sold (royalty interest). The lease
covered the south half of the northwest quar-
ter and all the southwest quarter of Section
10, Township 2 North, Range 66 West of the
6th Principal Meridian, totaling 240 acres.

Underlying the land are several mineral
formations. Proceeding from the surface
downward, they are the Niobrara, Codell,
and J–Sand. Kerr–McGee's predecessor
drilled two wells to the J–Sand formation—
the McPeek # 1, located in the forty-acre

northeast quarter of the southwest quarter, and the McPeek # 3, located in the forty-acre southeast quarter of the northwest quarter (together, the Drilled Tracts). The wells produced marketable hydrocarbons. In the parties' various agreements described hereafter, the remaining 160 acres of Section 10 owned by INB was referred to as the Undrilled Tracts.

Section 10

## Section 10

In 1997, the parties entered into Partial Release and Segregation Agreements (Segregation Agreements), which reassigned the working and royalty interests in Section 10. Kerr–McGee's predecessor assigned the working interest in the Undrilled Tracts relating to the Codell and Niobrara formations to INB's predecessor. It retained the working interest in all formations on the Drilled Tracts and the working interest in the J–Sand formation on the Undrilled Tracts. By segregating the tracts, INB regained the working interest and the corresponding right to become an operator (or to lease that interest to another party), and to drill and produce oil and gas from the Codell and Niobrara formations on the Undrilled Tracts.

Thereafter, Kerr–McGee's predecessor "recompleted" McPeek # 1 and # 3 to obtain production from the Codell formation. "Recompletion" means redrilling the same well bore to reach a new reservoir. It then began pumping from the Codell formation and has continued to pay INB a one-eighth royalty share from that production.

Contending that Kerr–McGee was effectively draining its wholly-owned minerals in the Codell formation from underneath the Undrilled Tracts, INB commenced this action seeking damages and injunctive and declaratory relief. Kerr–McGee answered and counterclaimed for declaratory judgment with respect to the rights and obligations of the parties under the Segregation Agreements. Kerr–McGee also moved to dismiss INB's claims and sought summary judgment on both parties' claims for declaratory relief.

The trial court granted Kerr–McGee's motion and entered summary judgment in its favor on the claims for declaratory judgment. This appeal followed.

## I.

INB asserts that the trial court erred in granting summary judgment because the order did not reach the merits of its claim for declaratory relief. Specifically, INB contends that it did not seek to obtain a share of the working interest in the Drilled Tracts

but, instead, sought a declaration that Kerr–McGee is wrongfully extracting minerals because Kerr–McGee has failed to pool all mineral interests or to apportion revenues it has obtained by draining minerals from the Undrilled Tracts. We perceive no error.

We review a summary judgment de novo. Summary judgment is proper only upon a showing that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); *Kauntz v. HCA–Healthone, LLC,* 174 P.3d 813, 816 (Colo.App.2007).

The trial court ruled that INB had no right to participate as a working interest owner in the production of minerals from the *Drilled Tracts.* We agree that this ruling did not specifically address INB's claim that Kerr–McGee unlawfully is appropriating its minerals from underneath the *Undrilled Tracts.* Even so, however, the trial court also specifically held that the "rule of capture" applied such that INB could not, as a matter of law, recover damages or obtain injunctive or declaratory relief to prevent the draining of INB's minerals from the Undrilled Tracts. Because resolution of the issues in this case thus turns, in major part, upon whether the rule of capture applies as between the parties, we first review that doctrine of law.

■ Under the rule of capture, a lessee under an oil and gas lease acquires title to the oil and gas that it produces from drilled wells, even though part of the minerals have migrated from adjoining lands. 1 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* § 204.4 (2004). Under the rule,

> a landowner could drill for oil or gas on its land wherever and with as many wells as the landowner thought appropriate. If oil or gas were found, the landowner would not be liable to adjacent landowners whose lands were also drained, even if the producing well were drilled next to the adjoining landowner's boundary. Moreover, the producing landowner would be entitled to produce as much oil or gas as possible, even though the ultimate recovery of oil or gas from the reservoir was diminished. Thus, under the law of capture, a landowner incurred no liability for causing oil or gas to migrate across property boundaries

and was not required to compensate adjoining landowners for draining oil and gas from their lands.

*Cowling v. Bd. of Oil, Gas & Mining,* 830 P.2d 220, 224 (Utah 1991) (citing *Thompson v. Consol. Gas Utils. Corp.,* 300 U.S. 55, 68, 57 S.Ct. 364, 81 L.Ed. 510 (1937)).

■ The rule of capture applies in all jurisdictions until modified by state law. 1 Williams & Meyers, § 204.4. Colorado has recognized the common law rule of capture. *Moshiek v. Lininger,* 130 Colo. 266, 271, 274 P.2d 965, 968 (1954). When the rule applies, the only protection that an owner has against loss of oil and gas to neighboring owners because of migration is the right to drill offset wells that would interrupt the flow of oil and gas being drawn to the neighboring wells. *See* 1 Bruce M. Kramer & Patrick H. Martin, *The Law of Pooling and Unitization* § 2.01 (2004); 1B Phillip D. Barber, *Colo. Methods of Practice* § 14.3 (2004). Thus, because a mineral owner generally has the right to drill offset wells, the rule of capture essentially precludes claims of improper drainage against a neighboring well operator.

However, as both parties here agree, when production practices are regulated by a state administrative agency charged with the prevention of waste and the protection of mineral owners' rights, the rule of capture may be modified and limited by appropriate regulation. *See* 1 Williams & Meyers, § 204.4; Barber, § 14.7 (rule applies in the absence of pooling or spacing); *Cowling,* 830 P.2d at 224–25 (Utah Oil and Gas Conservation Act modified rule of capture and authorized state board to regulate development and production of oil and gas for the purpose of preventing waste and protecting correlative rights; Act establishes a regulatory scheme that protects correlative rights while also continuing the law of capture to a limited extent).

The Colorado General Assembly has adopted such legislation in the Colorado Oil and Gas Conservation Act, sections 34–60–101 to –129, C.R.S.2007. Two means of regulation under the Act are spacing and pooling orders. The creation of spacing units, also known as drilling units, establishes parcels of land of approximately uniform size through-

out an oil or gas field, on each of which only a single well may be drilled. *See* § 34–60–116(1), (6), C.R.S.2007 (Commission has power to establish drilling and spacing units); § 34–60–116(3), C.R.S.2007 (only one well may be drilled within the unit); § 34–60–116(5), C.R.S.2007 (the operation of any well drilled in violation of an order fixing drilling units is prohibited); Barber, § 14.6.

Pooling occurs when various parcels or interests are combined for purposes of mineral extraction so that costs and revenues are apportioned among the interest holders. § 34–60–116(6) ("When two or more separately owned tracts are embraced within a drilling unit, or when there are separately owned interests in all or a part of the drilling unit, then persons owning such interests may pool their interests for the development and operation of the drilling unit"). Pooling may be voluntary or involuntary. *Id.*

Pooling does not, by itself, affect the number of wells that can be drilled. Instead, "[p]ooling orders are based on each landowner's fractional share of surface ownership in a drilling unit. A pooling order must, therefore, be based on the existence of a drilling unit." *Cowling,* 830 P.2d at 226 (statutory citation omitted) (also citing 6 Williams & Meyers, § 905.2).

Here, the trial court ruled that Kerr–McGee was not wrongfully extracting minerals from the Undrilled Tracts because the rule of capture applies. Inferentially, therefore, INB's only remedy would be to drill an offset well to itself capture its minerals and prevent the migration of those minerals to Kerr–McGee's wells. However, whether INB has the right to drill an offset well may be regulated by spacing or pooling orders in effect with regard to Section 10.

The parties acknowledge that a spacing order is in effect. However, the parties disagree on whether a spacing order alone may be sufficient to modify the common law rule of capture. INB contends that a spacing order alone is enough to modify the rule of capture and that Order 407–66, discussed below, does so. Kerr–McGee contends that a spacing order alone is never enough to modify the rule of capture and that both a pooling order and a spacing order are required.

We need not resolve that dispute, nor does the existence of that dispute preclude summary judgment, because we will assume, without deciding, that a spacing order, standing alone, may modify the rule of capture. We therefore examine what the spacing order in effect here provides.

Spacing for the Codell formation in Section 10 was originally established in 1983 when the Commission issued Order 407–1. The order establishes eighty-acre drilling units, but leaves the operator with the option of drilling another well on the undrilled forty-acre tract if the eighty-acre unit is not sufficient to drain the formation.

In 1991, the Commission issued Order 407–66 in response to an application filed by four operators who sought permission for wells they had drilled to the J–Sand formation to be recompleted to the Codell and Niobrara formations and to allow the commingling of production from the three different formations. The Order provides, in pertinent part:

FINDINGS

The Commission finds as follows:

. . . .

4. In Order No. 407–1, the Commission established 80–acre drilling and spacing units for the production of oil and/or gas and associated hydrocarbons from the Codell formation. In Order Nos. 407–10 and 407–13, the Commission ... include[d] production from the Niobrara formation and ... allow[ed] the downhole commingling of production from the Codell and Niobrara formations.

5. In Cause No. 232, the Commission established 320–acre drilling and spacing units for the production of gas from the "J" Sand ... with one well allowed for each unit.... [T]he Commission issued order No. 232–20 which allowed a second well to be drilled on each 320–acre unit.

. . . .

9. [A]dditional rules [should] be established for the protection of correlative rights and procedures to process recompletion, commingled and dual completion requests.

ORDER

NOW, THEREFORE, IT IS ORDERED that the following rules and regulations shall apply hereafter to a well or wells drilled, completed or recompleted in the Codell and/or Niobrara formations, where the production is commingled or dually completed with the "J" sand formations underlying the Codell–Niobrara Spaced Area described herein below:

. . . .

Rule 3. The location of all wells drilled to the "J" Sandstone formation underlying areas subject to Cause No. 407 and at a legal location ... shall be automatically approved, without hearing, as a legal location for production from the Codell or Niobrara formations, provided the following conditions are met:

a. The size of the voluntary unit for production from the Codell and/or Niobrara formations is either (i) 160–acres or (ii) the same size as the unit for production from the "J" Sand formation, with the unit for the Codell and/or Niobrara formations not less than that prescribed by Cause No. 407.

Relying on Rule 3, INB contends that Order 407–66 sets the spacing for the Codell formation at 160 acres. Therefore, it contends, the rule of capture is modified as to its property because it cannot drill an offset well upon any of the Undrilled Tracts. Kerr–McGee contends that Order 407–66 does not affect the forty-acre spacing allowed by Order 407–1 and, therefore, INB may drill offset wells on the Undrilled Tracts. For a number of reasons, we agree with Kerr–McGee.

First, the application before the Commission when it entered Order 407–66 simply requested the Commission to allow wells that had already been drilled to the J–Sand formation to be recompleted to the Codell and Niobrara formations and to allow commingling of production from all three formations. The application did not deal with new wells that would be drilled only to the Codell and Niobrara formations.

Second, the Commission findings recite portions of its Order 407–1 that established the eighty-acre (and discretionary forty-acre) drilling and spacing units for the Codell and Niobrara formations. The findings do not in any way indicate an intention to change that spacing.

Third, the Commission found that it should establish additional procedures to process recompletion, commingled, and dual completion requests, but that finding does not relate to any new wells.

Fourth, the Commission stated that Rule 3 would apply to wells drilled, completed, or recompleted in the Codell and Niobrara formations where the production is commingled or dually completed with the J–Sand formation. A new well drilled only to the Codell or Niobrara formation would not commingle production from the J–Sand formation.

Finally, the Rule's use of a 160–acre voluntary unit for production does not relate to new wells that would be drilled only to the Codell or Niobrara formation.

INB points, however, to the Segregation Agreements signed by the parties' predecessors, which state, in pertinent part, that "by Order No. 407 et seq., the [Commission] provides and allows for one hundred and sixty (160) acre drilling and spacing units for the Codell and Niobrara formations from [Section 10]." However, we construe that language to refer to the J–Sand drilling and spacing unit, which was referenced by the Commission in Finding 5 quoted above. Finding 5 references two wells being allowed in a 320–acre unit for the J–Sand; hence, Finding 5 establishes the 160–acre spacing for wells in that formation. Thus, the Segregation Agreements do not refer, by this language, to any potential new well.

We therefore hold that the spacing for the Codell and Niobrara formations on the property involved here is a minimum of forty acres. The existence of forty-acre spacing allows INB to employ the remedy of offset drilling. Thus, the rule of capture is modified only to that extent. Hence, because INB has four forty-acre parcels on which it can drill offset wells, it cannot successfully assert a claim against Kerr–McGee for mineral trespass, conversion, or theft.

To the extent that INB may assert that forty-acre spacing does not allow it to drill enough offset wells to prevent migration of its minerals to Kerr–McGee's wells, we note that it has very specific administrative reme-

dies available through the Oil and Gas Commission.

First, section 34–60–116(4), C.R.S.2007, states that the Commission, "upon application, notice, and hearing, may decrease or increase the size of the drilling units or permit additional wells to be drilled within the established units in order to ... protect correlative rights." Thus, INB may submit an application to the Commission for a reduction of the spacing unit. According to the statute, INB may also simply apply to drill additional wells.

Second, section 34–60–116(6) states:

When two or more separately owned tracts are embraced within a drilling unit, or when there are separately owned interests in all or a part of the drilling unit, then persons owning such interests may pool their interests for the development and operation of the drilling unit. In the absence of voluntary pooling, the commission, upon the application of any interested person, may enter an order pooling all interests in the drilling unit for the development and operation thereof. Each such pooling order shall be made after notice and hearing and shall be upon terms and conditions that are just and reasonable, and that afford to the owner of each tract or interest in the drilling unit the opportunity to recover or receive, without unnecessary expense, his just and equitable share.

Thus, INB may submit an application to the Commission for an involuntary or voluntary pooling order, the practical effect of which would be to apportion revenues and expenses from the two existing wells between INB and Kerr–McGee. Contrary to INB's assertion, we do not perceive that it is precluded, as a landowner, from making this application. The statute notes that "any interested person" may seek voluntary or involuntary pooling. § 34–60–116(6). While that term is not specifically defined, it clearly encompasses mineral interest owners.

We note Kerr–McGee's contention that the Segregation Agreements specifically preclude pooling; however, whether a private agreement may override a state regulation is a matter that the Commission could better address, at least initially.

Finally, Order 407–66, Rule 4 provides:

If an applicant wishes to produce oil, gas or associated hydrocarbons from the Codell or Niobrara formations and the well is not located at a legal location under these rules or under Cause No. 407, the applicant shall file with the Commission waivers or consents signed by the owners toward whom the well is located ... agreeing that the well may be located where the applicant proposes to drill the well. If written waivers or consents are not obtained from all of said owners, then the applicant shall give written notice of the proposed operation by certified mail to said owners. If an owner of the well is also the owner of a lease toward which the well is located, then the applicant must also obtain a waiver or consent or give written notice by certified mail to the mineral interest owner subject to such lease.... [I]f no written objections are filed within 30 days after notice is received, the Director is authorized to approve the proposed location as an exception location without a hearing. If a written objection is filed, or upon motion of the applicant or the Director, the application shall be heard in accordance with the rules of the Commission.

Thus, INB may file for a waiver or an exception with the Commission to drill a new well to the Codell or Niobrara formations.

In sum, we conclude that the trial court did not err in determining that the rule of capture applied such that INB could not, as a matter of law, recover damages or obtain injunctive or declaratory relief to prevent the draining of INB's minerals from the Undrilled Tracts. For these reasons, we affirm the summary judgment in favor of Kerr–McGee.

## II.

In light of our determination of the rule of capture issue, we need not address the parties' remaining contentions.

The judgment is affirmed.

Judge RUSSEL and Judge J. JONES concur.